Terri L. BASS, Plaintiff–Appellee,

v.

STOLPER, KORITZINSKY, BREWSTER & NEIDER, S.C. and Kathy Leschensky, Defendants–Appellants.

No. 96–2113.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1996.

Decided April 18, 1997.

Carla Andres, Vele & Andres, Evansville, WI, Richard J. Rubin, Santa Fe, NM (argued), for Plaintiff–Appellee.

Joseph R. Long, II (argued), Relles, Meeker & Borns, Madison, WI, for Defendants–Appellees.

Ernest J. Isenstadt, Stephen Calkins, Federal Trade Commission, Washington, DC, Joanne Faulkner, New Haven, CT, for Amici Curiae.

Before BAUER, ESCHBACH, and COFFEY, Circuit Judges.

ESCHBACH, Circuit Judge.

■ This case presents the novel question of whether the Fair Debt Collection Practices Act ("FDCPA" or "the Act"), 15 U.S.C. sec. 1692 et seq., applies to third-party efforts to collect payment from consumers who use a dishonored check for the purchase of goods or services. The answer turns on whether the payment obligation that arises from a dishonored check constitutes a "debt" as defined in the Act. On cross-motions for partial summary judgment, the district court answered in the affirmative, holding that (1) the Act applies to third-party collectors of dishonored checks, and (2) the defendants' collection practices violated the Act. On appeal, the defendants challenge only the former holding, arguing that the Act applies only to those debts arising from an offer or extension of credit. We now affirm.

## I.

To pay for groceries, Joe Arsenault wrote a check in the amount of $156.94 to "Copps," a local supermarket. The check, which was subsequently dishonored by his bank due to insufficient funds, was drawn on an account that Arsenault held jointly with plaintiff-appellee, Terri Bass. To collect on the check, Copps employed defendant law firm, Stolper, Koritzinsky, Brewster & Neider, S.C. ("SKBN"), who instituted collection activities against Arsenault under Wisconsin's civil recovery statute.[1]

SKBN's first three collection attempts were in the form of collection letters addressed solely to Arsenault. Arsenault did not respond. Its fourth collection letter, however, was addressed jointly to Arsenault and Bass. This letter, written and signed by defendant Kathy Leschensky, a non-attorney employee of SKBN, advised that she "draft[ed] and file[d] lawsuits" in collections matters, and that she would "hold off taking any action for 7 days" if Bass or Arsenault would make arrangements to pay. In response, Bass brought an action for statutory damages for defendants' failure to comply with the FDCPA in its collection letter. Among other complaints, Bass alleged that in the letter Leschensky misrepresented herself as an attorney and violated 15 U.S.C. secs. 1692e(3), 1692e(5), and that the letter did not include language specifically required by the Act stating that the purpose of the letter is to collect a debt and that any information received would be used solely in collection efforts. See 15 U.S.C. sec. 1692e(11). SKBN conceded before the district court that the letter lacked this required language.

Both parties moved for partial summary judgment, and on March 4, 1996, the district court granted Bass's motion, finding that 1) the Act applies to collectors of dishonored checks, and 2) the letter sent to Bass violated sec. 1692e(11) of the Act. Before our court, defendants challenge only the district court's finding that the Act applies to their collection activities.[2] In finding that the Act applied, the district court reasoned that a consumer who issues a subsequently dishonored check has an obligation to pay that meets the Act's definition of the term "debt."

We review a district court's entry of partial summary judgment de novo, drawing all reasonable inferences in the light most favorable to the nonmovant. *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d

---

1. The statute allows recovery of the face value of the check, actual and exemplary damages, and costs if the drafter knew, should have known, or recklessly disregarded that the check was drawn on a nonexistent account or an account with insufficient funds. Wis.Stat. sec. 943.245.

2. The parties subsequently stipulated to the award of costs, thus resolving the remaining issues in the case. The district court entered final judgment in favor of plaintiff on April 5, 1996.

62, 65 (7th Cir.1996); *Tolentino v. Friedman,* 46 F.3d 645, 649 (7th Cir.1995). Summary judgment is proper when there is no genuine issue of material fact left for the fact finder and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). In this case, the parties have no dispute over the material facts. The sole disagreement concerns whether the district court correctly interpreted a dispositive provision of the FDCPA. Our task on appeal is simply to review the district court's finding that the payment obligation arising from a dishonored check creates a "debt" under the FDCPA. We conduct this review pursuant to our jurisdiction under 28 U.S.C. sec. 1291.

## II.

■ On September 20, 1977, premised on Congressional concern that state protections against questionable debt collection practices were insufficient, President Carter signed into law the Fair Debt Collection Practices Act as an amendment to the Consumer Credit Protection Act ("CCPA"). 15 U.S.C. sec. 1601 et seq. The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices, including threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process. *See generally Jenkins v. Heintz,* 25 F.3d 536, 538 (7th Cir.1994), *aff'd,* 514 U.S. 291, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995) (reviewing the history and purpose of the FDCPA). A basic tenet of the Act is that all consumers, even those who have mismanaged their financial affairs resulting in default on their debt,

deserve "the right to be treated in a reasonable and civil manner." *Baker v. G.C. Services Corp.,* 677 F.2d 775, 777 (9th Cir.1982) (citing 123 Cong.Rec. 10241 (1977)).

In the most general terms, the FDCPA prohibits a debt collector from using certain enumerated collection methods in its effort to collect a "debt" from a consumer. Because not all obligations to pay are considered "debts" under the Act, the definition of "debt" thus serves to limit the scope of the FDCPA.[3] SKBN has conceded that the collection letter sent to Arsenault and Bass used one of the collection methods prohibited by the Act. Therefore, we face only the task of resolving the parties' dispute over the scope of the FDCPA, specifically whether the payment obligation that arises from a dishonored check constitutes a "debt" as defined in the FDCPA. Appellants' argument, that the FDCPA does not control the collection activities arising from worthless checks, rises and falls on its assertion that the only type of "debt" triggering application of the FDCPA is debt arising from an offer or extension of credit to the consumer. Appellee counters that neither the Act's language, nor the Act's legislative history, limits "debt" in this fashion. As support, each party relies on the appropriate side of a small, yet conflicting body of case law on this issue which has grown up in the district courts.[4]

■ As with all issues of statutory interpretation, the appropriate place to begin our analysis is with the text itself, *see Hughey v. United States,* 495 U.S. 411, 415, 110 S.Ct. 1979, 1982, 109 L.Ed.2d 408 (1990), which is the most reliable indicator of congressional

---

**3.** The terms "debt collector" and "consumer" are defined in the Act and also serve to limit the scope of the FDCPA. Both definitions are dependent on the definition of "debt." In this case, however, neither party challenges their status either as debt collector or consumer.

**4.** In addition to a few unpublished decisions, Bass relies on the following cases which hold that a dishonored check constitutes a "debt" under the FDCPA. *Narwick v. Wexler,* 901 F.Supp. 1275 (N.D.Ill.1995); *Newman v. Checkrite California, Inc.,* 912 F.Supp. 1354 (E.D.Cal. 1995); *In re Scrimpsher,* 17 B.R. 999 (Bankr. N.D.N.Y.1982). We note the existence of several other cases which assume the same. See, e.g.,

*Edwards v. National Business Factors, Inc.,* 897 F.Supp. 455 (D.Nev.1995); *Holmes v. Telecredit Serv. Corp.,* 736 F.Supp. 1289 (D.Del.1990); *Taylor v. Checkrite, Ltd.,* 627 F.Supp. 415 (S.D.Ohio 1986); *West v. Costen,* 558 F.Supp. 564, 571 (W.D.Va.1983). We know of only two published decisions specifically holding that a dishonored check does not create a "debt" under the FDCPA, and both opinions rely on *Zimmerman's* "holding" that a credit extension is required to create "debt" covered by the Act. See *Sarver v. Capital Recovery Assoc., Inc.,* 951 F.Supp. 550, 552 (E.D.Penn.1996); *Cederstrand v. Landberg,* 933 F.Supp. 804 (D.Minn.1996). As discussed infra, we disagree with *Zimmerman* on this issue.

intent. *Time Warner Cable v. Doyle,* 66 F.3d 867, 876 (7th Cir.1995). Appellants, however, skip the textual analysis in their opening brief and instead rely on the Act's legislative history to bolster their interpretation of the term "debt" as including only credit transactions. Given the complete lack of textual support in the Act for appellants' argument, this course of action is understandable. Resorting to legislative history is unnecessary here, however, because the language in the statute's definition of "debt" is plain.

A "debt," the collection of which is governed by the FDCPA,[5] is defined in the Act as

> any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. sec. 1692a(5). Appellants would have us read into this definition the additional requirement that the debt flow from a specific type of consumer transaction—one involving the offer or extension of credit. However, we see no language in the Act's definition of "debt" (or any other section of the Act) that mentions, let alone requires, that the debt arise from an extension of credit. Nor do we find patent ambiguity in the definition of "debt." The definition is not "beset with internal inconsistencies [or] ... burdened with vocabulary that escapes common understanding." *EEOC v. The Chicago Club,* 86 F.3d 1423, 1434 (7th Cir.1996). In the absence of ambiguity, our inquiry is at an end, and we must enforce the congressional intent embodied in the plain wording of the statute. *In re Witkowski,* 16 F.3d 739, 742 (7th Cir.1994); *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1326 (7th Cir.1990).

On the contrary, the plain language of the Act defines "debt" quite broadly as "any obligation to pay arising out of a [consumer] transaction." In examining this definition, we first focus on the clear and absolute language in the phrase, "any obligation to pay." Such absolute language may not be alternatively read to reference only a limited set of obligations as appellants suggest. *See, e.g., United States v. On Leong Chinese Merchants Assoc. Building,* 918 F.2d 1289, 1296–97 (7th Cir.1990) (holding that federal forfeiture statute at 18 U.S.C. sec. 1955(d) could not be read to exclude real property because the phrase "any property" unambiguously includes both personal and real property). As long as the transaction creates an obligation to pay, a debt is created. We harbor no doubt that a check evidences the drawer's obligation to pay for the purchases made with the check, and should the check be dishonored, the payment obligation remains. *See Williams v. United States,* 458 U.S. 279, 285, 102 S.Ct. 3088, 3092, 73 L.Ed.2d 767 (1982); see also Wis.Stat. sec. 403.413 (creating obligation of drawer to pay holder of check upon notice of the draft's dishonor).

Nor can we accept appellants' suggestion that "transaction," a term undefined by the Act, should be read restrictively in the definition of "debt" as "credit transaction." A word is not ambiguous merely because it is not defined in the statute. A fundamental canon of statutory construction instructs that in the absence of statutory definition, we give terms their ordinary meaning. *See Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *United States v. Wyatt,* 102 F.3d 241, 247 (7th Cir.1996). The ordinary meaning of the term "transaction" is a broad reference to many different types of business dealings between parties, and does not connote any specific form of payment. See Webster's New World Dictionary 1509 (2d ed. 1986) (defining "transaction" simply as "a business deal or agreement"). Although appellants would have us delve into legislative history to cast a different light on the term "transaction," we must give meaning to the plain language actually used by

---

**5.** In limited circumstances, state debtor protection laws will govern. The Act provides that the FTC may exempt by regulation certain debt collection practices of any State if that State's debtor protection laws provide restrictions on collection practices substantially similar to (or more stringent than) those in the Act, and if the State adequately enforces those laws. *See* 15 U.S.C. sec. 1692o.

Congress. Had Congress wanted to limit the meaning of the term "transaction," such a change would have been easily made. Because they did not, we are simply powerless to rewrite the Act's definition of "debt" by restricting the ordinary meaning of the term "transaction" to "credit transaction." *See United States v. Thomas,* 77 F.3d 989, 992 (7th Cir.1996) (holding that the phrase "any other term of imprisonment" was unequivocal, and could not be restrictively read as "any other *federal* term of imprisonment").

■■■ In sum, the fact that appellants would prefer a less broad definition of the term "debt" does not make the existing clear and unrestricted definition ambiguous. As the Supreme Court recently reminded us in *Hubbard v. United States,* 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), we are prohibited from reading into clear statutory language a restriction that Congress itself did not include. We must therefore hold that an offer or extension of credit is not required for a payment obligation to constitute a "debt" under the FDCPA.[6]

No circuit court has had occasion to pass on whether a dishonored check creates a "debt" under the FDCPA. However, appellants point us to *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163 (3d Cir.1987), which based its holding that the FDCPA did not apply to the conduct at issue in part on the proposition that an extension of credit was required under the Act. In *Zimmerman,* the issue was whether the defendant cable television companies, in demanding that plaintiff pay for allegedly pirated microwave television signals, were seeking to collect a "debt" within the meaning of the FDCPA. The court first concluded that the term "transaction" in the definition of debt is not broad enough to include asserted tort liability. It then added, without discussion, that the type of transaction resulting in "debt" under the FDCPA "is the same type of transaction as is dealt with in all other subchapters of the Consumer Credit Protec-

tion Act, i.e., one involving the offer or extension of credit to a consumer." Id. at 1168.

We can agree that the conduct in *Zimmerman* falls outside the reach of the FDCPA for the reason that pirating television signals did not amount to a "transaction" at all, arguably the true basis for decision in *Zimmerman.* Instead of being a consensual transaction for the purchase of consumer goods or services, the alleged conduct in *Zimmerman* was theft. And although a thief undoubtedly has an obligation to pay for the goods or services he steals, the FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services. *See, e.g., Shorts v. Palmer,* 155 F.R.D. 172, 175–76 (S.D.Ohio 1994) (obligation to pay for shoplifted merchandise not a "debt" under the FDCPA because "plaintiff has never had a contractual arrangement of any kind with any of the defendants."); *Mabe v. G.C. Services Ltd. Partnership,* 32 F.3d 86, 88 (4th Cir.1994) (obligation to pay child support not a "debt" under the FDCPA because it was not incurred in exchange for consumer goods or services).

However, to the extent that the *Zimmerman* court creates a requirement that only credit-based transactions constitute "debt" under the FDCPA, we must respectfully part ways. In reaching this conclusion, the court neither considered the plain language of the definition of "debt," nor examined the legislative history, but rather relied solely on the Act's codification as an amendment to the CCPA.[7] As we discuss infra, Congress' choice of statutory structure as evidence of intent is unnecessary given the Act's clear textual definition of the term "debt," and is also outweighed by the more persuasive forms of intent evidenced in the Act's legislative history.

### III.

Even if the language in the Act's definition of "debt" was so unclear as to require our

---

6. Thus we need not address the parties' disagreement about whether a merchant who accepts a check is in effect making an extension of credit.

7. Contrary to the court's statement, not all other subchapters of the CCPA regulate solely credit transactions. *See* discussion at part IV *infra.*

resort to extrinsic sources, these sources only further support our holding today. Consideration of the full body of legislative history of the Act, as opposed to the snippets quoted by the appellants, serves to reinforce a finding that non-credit transactions are included in the Act's purview.

First, legislative history reveals that Congress contemplated this very issue yet refused to require that "debt" covered by the Act arise only from a credit transaction. Early versions of the Act clearly included a credit extension requirement in defining "debt" as "any obligation arising out of a transaction in which *credit is offered or extended to an individual*, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." H.R. 13720, 94th Cong., 2d Sess. (1976) (emphasis added). We find persuasive the fact that this restrictive language was deleted from later drafts, and no reference to "credit" was ever reinserted in the definition. *See Securities and Exchange Comm'n v. Van Horn*, 371 F.2d 181, 185 (7th Cir.1966).

Second, although we do not deny that the inclusion or exclusion of certain statutory language is occasionally due to mere legislative oversight, legislative history belies that possibility here. A review of the debates during the House and Senate hearings on the FDCPA reveals acknowledgements by several debaters that the Act would include dishonored checks as "debt." *See, e.g.*, Hearings Before the Subcommittee on Consumer Affairs of the House Comm. on Banking, Finance and Urban Affairs on H.R. 29, 95th Cong., 1st Sess. at 257–61 (1977) (statement of John W. Johnson, Executive Vice-president, American Collectors Association, Inc.) (warning that if passed, the Act would make it more difficult for financial collection services to collect dishonored checks). In light of the apparent congressional consideration of this issue during the drafting and revising stages, we are hard-pressed to believe that Congress' ultimate decision to exclude references to "credit extensions" in the Act's definition of "debt" was accidental. In short, Congress was aware of discord on whether "debt" should be defined restrictively to include only credit transactions, but rejected this restriction in the text it adopted.

Finally, the legislative history provides an unequivocal statement of the drafters' intent on this issue: "[T]he committee intends that the term "debt" include consumer obligations paid by check or other non-credit consumer obligations." H.R.Rep. No. 95–131, 95th Cong., 1st Sess. 4 (March 29, 1977).[8]

In stark contrast to these indications of legislative intent, the portions of legislative history relied on by appellants do not prove their point, and in fact do little more than point out that Congress often discussed the Act using credit-based examples. As noted above, Congress also considered examples of non-credit transactions creating "debt." We have no quarrel with an argument that consumer default on installment debt was a principal focus at congressional hearings on the Act. However, appellants cannot direct us to any portion of the legislative history indicating that installment debt was the *only* focus.

---

**8.** A second form of extrinsic evidence on which Bass urges our reliance is the interpretation of the term "debt" proffered by the Federal Trade Commission in its Amicus brief. The Act specifically assigns public enforcement responsibility of the FDCPA to the FTC, which has the power to bring independent actions for violation of the Act as "unfair or deceptive act[s] or practice[s]" under Section 5 of the Federal Trade Commission Act. *See* 15 U.S.C. sec. 1692*l*(a). The FTC argues in its brief that the plain language and legislative history support a broad reading of the term "debt" to include dishonored checks. This interpretation is in accord with the FTC's comprehensive narrative interpreting the FDCPA, issued in 1988, which includes as an example of "debt" dishonored checks tendered in payment for goods or services used primarily for personal, family, or household purposes. See Statements of General Policy or Interpretation, Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed.Reg. 50,097, 50,102 (1988). Although resort to the FTC's opinion is unnecessary in light of the Act's unambiguous definition of "debt," and although we recognize that the FTC's interpretations of the Act are not binding on the courts, we acknowledge and give due weight to the FTC's informed interpretation of the term "debt." Moreover, had Congress disagreed with the way the FTC was reading the Act in carrying out its assigned power of enforcement, it could easily have made a clarifying amendment to the Act's definition of "debt."

**1328**

## IV.

Appellants then claim that Congress "obviously" intended that the FDCPA cover only debts arising from credit extensions merely by virtue of the fact that the FDCPA was passed as an amendment to the Consumer Credit Protection Act. We disagree. As a threshold matter, we reiterate that in light of the Act's plain language, our reliance on this interpretive argument is unnecessary. While it may be appropriate to derive some meaning from a statute's location in the United States Code when the statute itself is ambiguous, we are not faced with statutory ambiguity here.

Even were we to consider this extrinsic evidence, however, the Act's codification as an amendment to the CCPA is at best a weak tool in the search for Congressional intent. Although some courts have found the Act's placement in the CCPA suggestive, see, e.g., Zimmerman, 834 F.2d at 1168, the inference appellants would like us to glean from this structural relationship is insufficient to outweigh the contrary intent evidenced in the Act's legislative history, see supra. We also find the connection appellants suggest unpersuasive in light of the continuing expansion of the CCPA's protective landscape. Although the CCPA as originally enacted may have focused on consumer protection in credit-based financial transactions, amendments to the Act suggest an enlargement of the CCPA to include consumer protections in other financial arenas.[9] For example, the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. sec. 1693–1693r, which like the FDCPA was passed as an amendment to the CCPA, protects consumers by providing a "basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems."[10] 15 U.S.C. sec. 1693(b). Electronic Fund Transfers covered by the Act have three components: 1) a transfer of funds; 2) that is initiated by electronic means, and 3) debits or credits a consumer account. Noticeably absent is any requirement that, to be covered by the EFTA, the transfer must relate to a credit-based transaction. Codification of the EFTA, an Act governing electronic cash transactions and void of any credit reference or requirement, as an amendment to the CCPA thus refutes appellants' argument that the various titles of the CCPA regulate only credit based transactions. In fact, location of both the FDCPA and EFTA as amendments to the CCPA evidence the nature of the CCPA as a set of functionally free-standing acts united not by their regulation of credit transactions, but by their goal of providing protection to consumers in a variety of potentially abusive financial situations.

In making their argument, appellants quote the stated Congressional purpose of the Truth in Lending Act (one of the six subchapters of the CCPA) which is to "assure a meaningful disclosure of credit terms ... and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. sec. 1601(a). Appellants incorrectly label this language as the stated purpose for the entire CCPA as amended, and then ask us to read sec. 1601's reference to "credit" as evidence of Congressional intent that the FDCPA apply only to "debt" arising from credit transactions. We cannot ignore however, as appellants do, the fact that each subchapter of the CCPA has its own stated Congressional purpose. We need not look to sec. 1601(a) to glean Congress' intended purpose in enacting the FDCPA, because Congress clearly codified the separate and specific purpose they intend the FDCPA to serve: "It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure

---

9. The current set of protections housed in separate subchapters of the Consumer Credit Protection Act include the Truth in Lending Act, 15 U.S.C. secs. 1601–1667e (which houses the Consumer Leasing Act and the Fair Credit Billing Act); Restrictions on Garnishment, 15 U.S.C. secs. 1671–1677; the Fair Credit Reporting Act, 15 U.S.C. secs. 1681–1681t; the Equal Credit Opportunity Act, 15 U.S.C. secs. 1691–1691f; the Fair Debt Collection Practices Act, 15 U.S.C.

secs. 1692–1692o; and the Electronic Funds Transfer Act, 15 U.S.C. secs. 1693–1693r.

10. The EFTA was added as title IX of the CCPA by the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L. No. 95–630, 92 Stat. 3641, 3728 (1978), and was implemented by Regulation E, 12 C.F.R. 205 (1979).

that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. sec. 1692(e). The FDCPA is a self-contained, functionally complete act housing its own purpose, prohibitions, definitions, enforcement procedures, and remedies. The FDCPA requires no cross reference to other titles or subchapters of the CCPA, nor is such cross reference necessary to either understand or apply the Act's provisions.

We find appellants' suggestion that we graft a credit requirement, either from the location of the FDCPA in the United States Code or from the independent codified purpose of the Truth in Lending Act, untenable.

### V.

In their final attempt to excuse their prohibited collection practices, appellants argue that dishonored checks do not constitute "debts" under the FDCPA because "the tender of a worthless check is a criminal and tortious act, not a consumer credit transactions [sic]." Br. at 13. We take issue with this statement's accuracy as well as its implication that any dishonored check should fall outside the act pursuant to a judicially created fraud exception.

Appellants misstate the law when they categorize all dishonored checks as criminal and tortious. Both under the common law of fraud, a specific intent crime, and under most state criminal statutes which specifically address dishonored checks, liability attaches only if the drawer either knew or intended that the check be dishonored *at the time the check was drawn.* A bank may refuse payment on a check for a variety of reasons lacking in the necessary fraudulent intent: administrative holds on the account of which

the drawer is unaware, bank error, and the drawer's reliance on deposited checks that themselves are dishonored, to name a few. Even when the drawer is at fault for the dishonor, the requisite intent may be absent—for example, when the drawer makes a simple miscalculation or has a subsequent emergency need for funds.

We recognize that by the time a dishonored check has been turned over to a third party collector, the issuer has typically received notice of dishonor yet has still failed to pay. Nevertheless, an issuer whose intention not to pay the check arises only at some point *after* it is issued has still not, in most jurisdictions, committed a fraudulent or criminal act. The requisite knowledge or intent that the check be dishonored must arise at the time the check is written.[11] We therefore must reject appellants' argument that all dishonored checks are fraudulent and thus not covered by the Act.

Almost as a second thought, appellants state their (unsupported) belief that the specific check at issue was passed with fraudulent intent, on the grounds that "Argenault's [sic] tender of the worthless check violated . . . Wisconsin's criminal statute." However, they present no evidence that Bass specifically intended Arsenault to pass a check that she knew would be dishonored. Arsenault's intent to pass a worthless check, even if proven, is not proof of Bass's knowledge or intent. Appellants have thus failed to conclusively establish that Bass intended to pass a worthless check.

Because we reject appellants' fraud-based arguments here, we are not faced with the need to determine whether fraudulent intent, even if proven, should make a difference—that is, whether a fraud exception to the Act is appropriate. Nevertheless, we note our discomfort with the proposition that the

11. In addition to state criminal statutes requiring strict proof of knowledge or intent of check dishonor at the time the check was written, several statutes presume that the drawer intended dishonor at the time the check was written if the drawer receives notice of dishonor but fails to make good on the check within a certain statutory period of days. However, the presumption is often rebuttable. *See, e.g.,* ARK.CODE ANN. § 5–37–307 (knowledge of insufficient funds is presumed if bank notifies issuer of dishonor within 30 days and issuer fails to pay within 10 days of notice); IND.CODE § 35–43–5–5 (fact that check was refused or that person had no account at the bank is prima facie evidence of knowing dishonor); KAN.STAT.ANN. § 21–3707 (failure to pay the amount due within seven days after notice of dishonor constitutes prima facie evidence of intent to defraud).

courts should create a fraud exception where none exists in the Act's text.[12] A review of the legislative history reveals that Congress considered the entire field of defaulting debtors, stating its belief that most debtors fully intend to repay their debts. *See* S.Rep. No. 382, 95th Cong., 1st Sess. 3 (*reprinted in* 1977 U.S.Code Cong. & Admin.News 1695, 1697). "Most" is not "all," however, yet Congress still chose not to exempt debt collectors from following the Act if they could prove that the consumer intended his check to be dishonored or accepted credit from a merchant intending default. No section of the Act requires an inquiry into the worthiness of the debtor, or purports to protect only "deserving" debtors. To the contrary, Congress has clearly indicated its belief that no consumer deserves to be abused in the collection process. Moreover, we think that such a fraud exception would violate the spirit of the Act. The Act's singular focus is on curbing abusive and deceptive collection practices, not abusive and deceptive consumer payment practices. We are not unaware that in some cases, the absence of a fraud exception will allow consumers who intend to pass worthless checks to invoke the protections of the FDCPA. And although we have no sympathy for a debtor who intends to default on his obligations, we believe that the sole wrong intended to be remedied by the FDCPA is debt collector abuse. Absent an explicit showing that Congress intended a fraud exception to the Act, the wrong occasioned by debtor fraud is more appropriately redressed under the statutory and common law remedies already in place, not by a judicially-created exception that selectively gives a green light to the very abuses proscribed by the Act.[13]

12. No court has yet created such an exception.

13. Finally, in light of the Act's clear definition of "debt," supported by the weight of the legislative history evidencing an intent that the Act be interpreted as plainly written, we note that appellant's policy arguments to the contrary are best directed to the legislature.

14. In compliance with Seventh Circuit Rule 40(e), this opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing en banc on the question of whether "debt" as defined in the Fair

## VI.

The district court is AFFIRMED.[14]

BAUER, Circuit Judge, dissenting.

I respectfully dissent. Judge Eschbach has written a powerful opinion that I find myself unable to join. The notion that Congress, in passing the FDCPA, had in mind the protection of those who give bad checks for goods and services is one I cannot in conscience join.

In this position I am comforted by several things, not the least is the knowledge that the act itself does not mandate such a result; indeed, if it did, the opinion could have consisted of a paragraph or two pointing out the mandate. A second and, it seems to me, significant point also appears in the majority opinion: "No Circuit Court has had occasion to pass on whether a dishonored check creates a 'debt' under the FDCPA." Indeed they have not, and I believe for good reason—it doesn't apply.

Checks are, in the majority of cases, used to pay for bills already outstanding; that is to say, in response to bills sent asking for payment for goods and services delivered some time in the past; a transaction that did not contemplate simultaneous delivery and payment. In short, to pay a bill where credit has already, explicitly or implicitly, been extended. A case can be made for the position that, if the check so used is drawn on an account with insufficient funds—or no funds at all—the payee is in no worse position than before the dishonored instrument was delivered.[1]

Debt Collection Practices Act can only arise from a transaction involving the offer or extension of credit to a consumer.

1. In a better position, in some small respect: the maker of the check can sue on the instrument itself or it can be used as an acknowledgement of the debt and the amount, both items of which might have been disputed on a simple suit to collect the debt. And, at any rate, the deliverer intended to extend credit when he failed to demand cash or check on delivery (unless the goods were sent C.O.D., of course).

No case can be made that would demonstrate that checks given in immediate payment of goods and services are "debts" contemplated by the act or that acceptance of the instrument was either a voluntary assumption of a credit transaction or anything other than an accommodation to the check writer. The seller is simply relying on the warrant implied in the delivery of the check that the writer has funds in the institution drawn upon and that the institution will immediately honor the check, when presented, by payment in legal tender. So basic is this concept that Black's Law Dictionary gives both the classic definition of "check" as "[a] draft drawn upon a bank and payable on demand, signed by the maker or drawer, containing an unconditional promise to pay a sum certain in money to the order of the payee" and the equally true definition of "bad check": "A check which is dishonored on presentation for payment because of no, or insufficient, funds or closed bank account. Writing or passing of bad checks is a misdemeanor in most states."

In fact, a great number of retail establishments (and deliverers of services as opposed to goods) will not honor personal checks. And those that do are relying on the warrant of the maker that the money will be found forthwith on presentation. (Many, if not most, general retail transactions presently involve commercial credit cards; Visa, Mastercard or the like. And in those transactions, the credit relationship is between the issuer of the card—generally a bank—and the card holder. The purveyor of goods and services gets paid without question from the bank because the validity of the card can be verified *before* acceptance.)

When accepting a check, the payee is peculiarly at the mercy of the maker; only the maker and the bank know whether money is available to pay the amount of the note and the banker is forbidden to disclose the condition of the account unless called upon to honor the draft (or certify it, which amounts to the same thing). So the recipient must rely on the maker's trustworthiness. If anyone needs protection, it is the provider of goods and services who accepts a check in exchange.

Moreover, unlike the extender of credit, the payee of a bad check incurs an absolute loss because his banker will charge a penalty for processing a dishonored check and the payee has lost the use of the money he was entitled to receive. And, of course, if he was relying on the uncollected funds for his own cash-flow purposes, he may very well do serious harm to his own credit rating.

Apart from all of that, I believe that the majority opinion gives too little weight to the reasoning of *Zimmerman v. HBO Affiliate*, 834 F.2d 1163 (3rd Cir.1987). It is not sufficient to point out that Zimmerman involved a theft. The majority says "and although a thief undoubtedly has an obligation to pay for the goods or services he steals, the FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer related goods or services. *See, e.g., Shorts v. Palmer*, 155 F.R.D. 172, 175–76 (S.D.Ohio 1994) (obligation to pay for shoplifted merchandise not a 'debt' under the FDCPA because 'plaintiff has never had a contractual arrangement of any kind with any of the defendants.')." Where a contract of sale is goods-for-money, the acceptance of a check is not a consent to receive something less than money; it is a convenience to the maker not to require legal tender. The giving of a bad check for goods or services differs from shoplifting only in degree, not in kind; in either event, it is a theft.

Nor is it an answer to say that the fraud involving dishonored checks is not always "criminal or tortious" because "fraud is a specific intent crime".[2] What this says is that when the defense of lack of bad intent is raised, the government (not the payee of the

---

2. Theft, like fraud, is a specific intent crime. To obtain a conviction, the government must prove beyond a reasonable doubt that the defendant intended to deprive the owner permanently of some property. Someone who appears to have shoplifted may then, of course, have a valid defense—that he did not act with the requisite intent. One who walks out of a country store with a can of tunafish in his pocket that he forgot to pay for has not committed theft. The facts, however, may have terrible consequences before the defense can be raised. *See, e.g., My Cousin Vinny*, at Local Blockbuster Video Rental Store.

check who, for criminal prosecution purposes, is only a witness to the crime) must prove intent to defraud. Most jurisdictions have over the years taken the position that issuing a check without having sufficient monies on deposit to support the draft is prima facie evidence of fraud.[3] It is up to the writer to produce some basis for the belief that no fraud was intended. (It is, of course, only a burden of production, not of persuasion, but it does not alter the basic rule that a bad check creates an inference of fraud.)

I do not think that one can observe a "to let" sign, move into an empty apartment and then demand a thirty-day notice before an eviction can proceed. One cannot create a landlord-tenant relationship unless both parties agree. Nor, it seems to me, can one create a debtor-creditor relationship without the agreement of both parties. If I choose not to be a creditor, you cannot force me into that position.[4]

Absent a creditor-debtor relationship voluntarily assumed there is no "debtor" protected by the FDCPA. The victim is not the deliverer of the bad check; it is the recipient and, if protection is to be provided, it should be to him. The FDCPA, I believe, does not cover bad checks given for goods and services. It is not necessary in this case to decide whether bad checks given for an existing debt come under the protection of the act. That is not the issue.

I would reverse the judgment.

---

**3.** In Illinois, for instance, the government indicted and convicted one Kevin Sumner by showing that Sumner did not have adequate funds on deposit on either the day of issuance or the day of presenting the check. The court said "Sumner, *while agreeing that the State presented enough evidence to establish a statutorily adequate prime facie case,* argues that his own testimony was legally sufficient to establish a reasonable defense showing that he lacked the necessary intent to defraud. Therefore, Sumner claims, the presumption of guilt established by the State's prima facie case was rebutted, and the prosecution was required to refute his defense by presenting convincing proof that Sumner had the requisite intent to defraud when he issued the check in question. *We agree with*

*Sumner."* (emphasis added) *People of the State of Illinois v. Sumner,* 107 Ill.App.3d 368, 370, 63 Ill.Dec. 137, 437 N.E.2d 786 (1st Dist.1982).

**4.** I do not think that a purchaser of goods can force a seller to become a creditor by delivering a bad check in payment of goods any more than I believe a seller of goods can force anyone into a position of being a debtor simply by delivering goods he has not agreed to accept. The relationship of seller-buyer is much different from creditor-debtor. The former relation can blossom into the latter only when done so by voluntary acts of both parties. When a bad check is delivered for goods or services it creates a debt by tortious conduct, not a debt by contract.