EMILIO M. GARZA, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority’s conclusion that the district court correctly dismissed Hamilton’s remaining claims for lack of subject matter jurisdiction. In addition, I agree that it would be inappropriate for us to rule on the issue of whether Healthcare Recoveries, Inc. (“HRI”) constitutes a “debt collector” under the Fair Debt Collection Practices Act (“FDCPA”). I cannot, however, agree with the majority’s *394 conclusion that an obligation to pay an insurance subrogation claim constitutes a “debt” under the FDCPA.
The FDCPA defines a “debt” as follows:
[A]ny obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.
15 U.S.C. § 1692a(5) (2000).
The majority opinion focuses on the words “any obligation” and “arising out of,” and concludes that the FDCPA applies to an insurance subrogation claim. The reasoning in the majority opinion appears to be as follows: United Health Care of Louisiana, Inc. (“United”) agreed to provide insurance for Hamilton (via an agreement with his father’s employer). That insurance agreement is a “transaction” that is “primarily for personal, family, or household purposes” because it provides health care insurance for employees and their families. The agreement is a “but for” cause of United’s subrogation claim, for, without the agreement, United would have no claim for reimbursement. Therefore, the majority concludes, the subrogation claim “arises out of’ a consumer transaction for insurance, and constitutes a “debt” for purposes of the FDCPA.
I doubt, however, that the matter is so simple. The word “debt” as defined in the FDCPA does not have the expansive scope that the majority’s analysis suggests. The Seventh Circuit (whose decisions are relied on extensively by the majority opinion) has reasoned that “not all obligations to pay are considered ‘debts’ under the [FDCPA].” Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1324 (7th Cir.1997). On the contrary, “the definition of ‘debt’ ... serves to limit the scope of the [Act].” Id.; see also Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1371 (11th Cir.1998) (“[W]e do not hold that every consensual or business dealing constitutes a ‘transaction’ triggering application of the FDCPA (such a holding would be contrary to the plain language of the statute limiting applicability to specified transactions ... I.”).[1]
In addition, only an extremely broad interpretation of “arising out of’ could lead the majority to conclude that United’s sub-rogation claim “aris[es] out of’ the single transaction between United and Hamilton. The subrogation claim asserted by United arose out of a string of events. First, there was the insurance contract between United and Hamilton. Second, there was the contract for uninsured and/or underin-sured motorist coverage (“UM policy”) between Hamilton and State Farm. Third, there was the accident that injured Hamilton. Fourth, there was United’s payment *395 of Hamilton’s medical bills. Fifth, there was the payment by State Farm to Hamilton pursuant to the UM policy. So, although one might say that this subrogation claim arose out of the underlying insurance agreement between United and Hamilton, one could also say that the claim arose out of any one of these other events. It would be most accurate to say that the subrogation claim arose out of the combination of events, and not out of a single transaction.[2]
Nevertheless, the majority opinion concludes that “[t]here is no question that the obligation to pay arose out of Hamilton’s transaction of purchasing insurance.” The opinion supports this conclusion by asserting that this Court has given the phrase “arising out of’ an expansive interpretation. It is true that we have construed the phrase broadly when interpreting insurance policies. See Am. States Ins. Co. v. Bailey, 133 F.3d 363, 370 (5th Cir.1998) (“This court has held that the words ‘arising out of,’ when used within an insurance policy, are ‘broad, general, and comprehensive terms effecting broad coverage.’ ... The words are ‘understood to mean “originating from,” “having its origin in,” “growing out of,” or “flowing from.”’”) (quoting Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co. of Wis., 189 F.2d 374, 378 (5th Cir.1951)) (emphasis added); Jarvis Christian Coll. v. Nat’l Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742, 747 n. 5 (5th Cir.1999) (same). We have not, however, consistently used this expansive interpretation of “arising out of’ in the context of interpreting federal statutes. See Humphries v. Various Fed. USINS Employees, 164 F.3d 936, 942-44 (5th Cir.1999) (noting, in a case involving a federal statute, the different interpretations given by courts to terms such as “arising from” and “arising out of’). Therefore, a broad interpretation of “arising out of’ may not be appropriate in this context.
Indeed, the case law in this area provides no support for the majority opinion’s expansive interpretation of “arising out of.” Each case in which other appellate courts found a “debt” to exist under the FDCPA involved an obligation that arose out of a single transaction. Thus, courts have determined that an obligation to pay home owner’s association dues, Ladick v. Van Gemert, 146 F.3d 1205, 1207 (10th Cir.1998); Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d 477, 482 (7th Cir.1997), an obligation to pay for water and sewer service, Pollice v. Nat’l Tax Funding, L.P., 225 F.3d 379, 401 (3d Cir.2000), an obligation to make good on a dishonored check, Snow v. Jesse L. Riddle, P.C., 143 F.3d 1350, 1353 (10th Cir.1998); Duffy, 133 F.3d at 1124; Charles v. Lundgren & Assoc., P.C., 119 F.3d 739, 742 (9th Cir.1997); Bass, 111 F.3d at 1330, and an obligation to pay back rent, Romea v. Heiberger & Assoc., 163 F.3d 111, 119 (2d Cir.1998), all constitute “debts” under the FDCPA. In each case, the obligation was a promise to pay for a particular good or service. In each case, the obligation at issue depended on a single transaction.
In cases where courts have found no “debt,” the relationship between the obligation and the consumer transaction was more attenuated. For example, courts have held that the obligation to pay prop *396 erty taxes does not constitute a debt for purposes of applying the FDCPA. Pollice, 225 F.3d at 401-02; Beggs v. Rossi, 145 F.3d 511, 512-13 (2d Cir.1998). The obligation to, pay property taxes does, in a sense, “arise out of’ the purchase of a home. Indeed, under the majority’s expansive interpretation of “arising out of,” it would be nearly impossible to' conclude otherwise. After all, the purchase of a home is a “but for” cause of the obligation to pay property taxes. In Pollice, however, the Third Circuit found that the obligation to pay property taxes did not arise from the purchase of property, but rather from the “fact of ownership.” 225 F.3d at 402 (emphasis in original). The Third Circuit declined to adopt an interpretation of “arising out of’ as expansive as that of the majority in this casé. Indeed, no case appears to support the majority opinion’s broad reading of “arising out of.”[3]
The central problem with the majority’s analysis is that it oversimplifies the issue in this case. The majority lumps the sub-rogation provision with the rest of the insurance agreement, without recognizing that not all obligations under the agreement are identical for purposes of the FDCPA. It seems- beyond dispute that a consumer’s obligation to pay the premiums on an- insurance policy “arises out of’ the insurance agreement, and thus constitutes a “debt” under the FDCPA. The obligation to pay premiums fits in perfectly with, the line of cases cited above. The obligation clearly arises out of a single transaction (the insurance agreement) and pays for a particular service (health insurance).
Subrogation by its very nature, however, cannot fit into this neat paradigm. Subro-gation never arises out of a single transae *397 tion. Subrogation is “[t]he substitution of one person in the place of another with reference to a lawful elaim[.]” Black’s Law DICTIONARY 1427 (6th ed.1990). In essence, subrogation is an assignment. See Rohner, Gehrig & Co. v. Capital City Bank, 655 F.2d 571, 579 (5th Cir.1981) (observing that, under the law of many states, “a subrogation agreement is equivalent to an assignment”). One person (the subrogor) assigns to another person (the subrogee) a claim that the subrogor has against a third party. In the health insurance context, this concept plays out as follows: an insurance company promises the insured that, in case of an accident, it will pay his medical bills. The insured no longer has to worry about recovering from a tortfeasor or any other source because the insurance company has agreed to cover his medical costs. The insured party (the subrogor) therefore assigns to the insurance company (the subrogee) his right to recover from a tortfeasor or other source. But that subrogation claim does not arise until the insured is actually in an accident, and has the right to receive money from the third party. Thus, a subrogation claim cannot arise out of a single transaction between two parties.[4]
Nor does a consumer, by paying a sub-rogation claim, receive a particular good or service. If valid, United’s subrogation claim would serve two purposes, neither of which directly benefits Hamilton. First, the subrogation claim would reimburse United for paying Hamilton’s medical bills. Second, the claim would prevent Hamilton, the insured victim, from receiving money from both United and State Farm and thereby being overcompensated for his injuries. See Greenblatt, supra, at 1340-41 (noting that subrogation serves to reimburse the insurance company and prevent the insured from being “unjustly enriched”).[5] Thus, unlike the “debts” discussed above — the obligations to pay homeowners’ association dues, water and sewer bills, or rent — Hamilton’s alleged obligation does not pay for a particular good or service. Indeed, Hamilton does not receive any direct benefit for paying a subrogation claim.[6] On the contrary, Unit *398 ed’s subrogation claim, if valid, would prevent Hamilton from receiving a “windfall” by collecting from both United and State Farm.[7]
This last point helps underscore why it would be inappropriate to apply the FDCPA in this case. Hamilton’s obligation does not fit our traditional conception of “debt.” United is not demanding money from a poor consumer who has recently been down on his luck. United has already paid Hamilton’s medical bills. Now State Farm has given Hamilton money to pay for essentially the same expenses. United’s subrogation claim, if valid, would simply prevent Hamilton from being paid twice. The FDCPA was not designed to cover this case. The Act was drafted to protect consumers who were having difficulty paying their debts. It was not intended to protect an accident victim, who attempts to get a “windfall” by receiving money from multiple sources.
There is no support in either text or precedent for the majority’s conclusion that an obligation to pay an insurance subrogation claim constitutes a “debt” for purposes of applying the FDCPA. I, therefore, respectfully dissent.

. The majority opinion refers to language in Bass suggesting that the FDCPA should be given a broad interpretation. It is important to keep in mind the context of the Bass court’s statements. The Seventh Circuit was determining whether it should follow dicta from the Third Circuit’s decision in Zimmerman v. HBO Affiliate Group, 834 F.2d 1163 (3d Cir.1987). Zimmerman suggested that the FDCPA applied only to obligations involving an "extension of credit," such as credit card debts or other situations in which a consumer defers payment on an item. Id. at 1168-69. The Seventh Circuit, in discussing the "absolute language” of the FDCPA, was determining only that the Zimmerman court was wrong to limit the Act to obligations involving an extension of credit. Bass, 111 F.3d at 1325. As the language quoted in this dissent makes clear, the Bass court did not mean that there were no limitations on the definition of "debt." See also Duffy v. Landberg, 133 F.3d 1120, 1123 (8th Cir.1998) (also referring to the broad wording of the Act in order to reject the dicta in Zimmerman).

. The district court wisely noted the degree to which United's subrogation claim is attenuated from the underlying contract. See Hamilton v. United Healthcare of La., Inc., Nos. Civ.A. 01-585, 01-650, 2001 WL 812076, at *3 (E.D.La. July 16, 2001) (''[H]ad Plaintiff not engaged in another transaction wholly unrelated to his contract with United, i.e., obtaining his own UM policy through another insurer, no obligation would exist.”) (emphasis added).

. Hamilton relies on Brown v. Budget Rent-A-Car Systems, Inc., 119 F.3d 922 (11th Cir.1997), for the proposition that a "debt” under the FDCPA does not have to arise out of a single transaction. In that case, Brown rented at truck and dolly from Budget. Id. at 923. Not long after leaving the rental agency, Brown was in an accident. Id. Budget demanded that he pay for the repair of the vehicle, as well as loss of use and administrative fees. Id. Brown’s insurance company paid for the repairs, but Brown refused to pay the other charges, contending that they were covered by a Loss Damage Waiver provision in the rental agreement. Id. After Budget hired a collection agency, Brown sued, contending that the agency's practices violated the FDCPA. Id. The district court dismissed Brown’s claim, finding that the FDCPA applied only to transactions involving an extension of credit. Id. at 923-24. The Eleventh Circuit reversed, holding that the FDCPA was not limited to such transactions. Id. at 925. The court did not, however, hold that Brown’s obligation in fact constituted a "debt” under the FDCPA. See Hawthorne, 140 F.3d at 1371 ("Although we recently held [in Brown ] that a 'debt' need not require the extension of credit ... we have not previously addressed the limits of the FDCPA’s definition of 'debt.' ”). Therefore, Brown provides no support for Hamilton's contention that a "debt” can arise out of a series of events.
It is true that the Eleventh Circuit remarked in Hawthorne that "the facts delineated in Brown do not exclude the possibility that the obligation in that case constituted a 'debt' under the FDCPA.” Hawthorne, 140 F.3d at 1373. But the court made that remark in order to distinguish Brown from the case before it. In Hawthorne, an insurance company brought a subrogation claim against a tortfeasor. Id. at 1369. The tortfeasor sued the debt collection agency, claiming violations of the FDCPA. Id. The Eleventh Circuit found that the tortfeasor's alleged obligation did not constitute to a "debt” because it did not arise out of a consensual transaction; there was never any agreement between the tortfeasor and the insurance company for the injured party. Id. at 1371. The court contrasted Brown by noting that "Brown's obligations arose at least in part out of a business transaction where Brown contracted for what appear to be personal services (the truck rental and the loss damage waiver protection).” Id. at 1373. The Hawthorne court did not state that the obligation in Brown should be considered a "debt” for purposes of the FDCPA.

. Indeed, the relationship between an insured individual and an insurance company is not typically described as a debtor-creditor relationship. Instead, the insured party (the accident victim) is considered "the creditor” and the tortfeasor (or other party that owes the insured money) is "the debtor.” See Jeffrey A. Greenblatt, Insurance and Subrogation: When the Pie Isn’t Big Enough, Who Eats Last? 64 U. Chi. L.Rev. 1337, 1340 (1997). The insured and the insurance company are known as the "subrogor” and "subrogee,” respectively. Id.

. When an insurance company collects from the tortfeasor that caused the accident, subro-gation serves a third purpose: “it places the burden of compensation on the tortfeasor and thus deters injurious behavior.” Greenblatt, supra, at 1341. Because HRI is attempting to recover payments made by State Farm, this third factor is not at issue in the instant case.

. It may be that insured individuals do benefit indirectly from subrogation. Insurance companies may be able to reduce their costs through subrogation. They might pass these savings along to their customers in the form of lower premiums. See Greenblatt, supra, at 1354-55 (suggesting that insurance companies can take subrogation into account in setting their rates, and set lower rates for customers that agree to subrogation); Steven P. Croley & Jon D. Hanson, The Nonpecuniary Costs of Accidents: Pain-and-Suffering Damages in Tort Law, 108 Harv. L.Rev. 1785, 1870 n. 292 (1995) (similarly opining that insurance companies might lower rates ex ante if they are likely to recover their costs through successful subrogation claims). In paying a subrogation claim, however, an insured party who has been injured in an accident is not paying for this particular benefit.
Prior to the accident, the insured party might have benefitted when other accident victims paid subrogation claims. That would be the case if the insurance company passed off its savings (the reduction in costs resulting from subrogation) onto its consumers in the *398 form of lower premiums. After the accident, however, the accident victim himself does not receive any direct benefit by paying the subro-gation claim.

. Scholars have noted that subrogation serves an important function: by preventing an insured party from being overcompensated for injuries suffered in an accident, it helps reduce the problem of "moral hazard" — the possibility that an insured party might deliberately put himself at risk in order to obtain a "windfall.” Alan O. Sykes, Subrogation and Insolvency, 30 I. Legal Stud 383, 384 (2001) (observing that the “public policy against such ‘windfalls' is an oft-stated rationale for subrogation”).