Gene KVASSAY and Patricia McEnulty, on their behalf and on behalf of the class they represent Plaintiffs,

v.

Paul HASTY, Jr, et al., Defendants.

No. CIV.A. 00–1364–JTM.

United States District Court,
D. Kansas.

Dec. 31, 2002.

N. Russell Hazlewood, Hinkle Elkouri Law Firm, L.L.C., Wichita, KS, Jacob S. Graybill, Patterson, Gott & Graybill, Wichita, KS, John T. Moore, Coy M. Martin, Moore Martin, LC, Wichita, KS, for Gene Kvassay, Patricia McEnulty.

Charles E. Millsap, Amy Fellows, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Paul Hasty, Jr., Wallace, Saunders, Austin, Brown and Enochs, Chtd.

Adam A. Edwards, Blackwell Sanders Peper Martin, LLP, Overland Park, KS, Kristopher A. Kuehn, Todd A. Scharnhorst, Tamara L. Niles, Triplett Grier, Overland Park, KS, for Armored Services Inc.

Adam A. Edwards, Blackwell Sanders Peper Martin, LLP, Overland Park, KS, Kristopher A. Kuehn, Todd A. Scharnhorst, Tamara L. Niles, Overland Park, KS, for International Sec. Services Inc., Andre Ya Deau, Marshall & Sterling, FirstCity Ins. Brokers, Ltd., Hiscox Dedicated Corporate Member Ltd.

Adam A. Edwards, Blackwell Sanders Peper Martin, LLP, Overland Park, KS, Kristopher A. Kuehn, Todd A. Scharnhorst, Overland Park, KS, for FirstCity Ins. for Cargo & Security Transits.

Adam A. Edwards, Blackwell Sanders Peper Martin, LLP, Overland Park, KS, Kristopher A. Kuehn, Overland Park, KS, for Roberts & Hiscox.

Kristopher A. Kuehn, Todd A. Scharnhorst, Tamara L. Niles, Overland Park, KS, for Lloyd's.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on the Plaintiffs' partial motion for summary judgment (Dkt. No. 134) and the Defendants' motions for summary judgment

(Dkt. Nos. 129, 138) in this debt collection case. Plaintiffs bring this action on behalf of themselves and a class of similarly situated individuals; they assert claims against the Defendants, alleging that the Defendants violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C.A. § 1692, *et seq.* Both the Plaintiffs' and Defendants' summary judgment motions are fully briefed and ripe for determination. For the reasons set forth below, the court grants the Plaintiffs' motion in part and denies the motion in part; grants the Hasty Defendants' motion in part and denies the motion in part, and grants the WTG defendants motion in part and denies the motion in part. Accordingly, the court dismisses the claims against the Hasty and WTG Defendants.

## I. Statement of Facts

On September 1, 2000, Plaintiffs Gene Kvassay and Patricia McEnulty filed a Class Action Complaint in the United States District Court of the District of Kansas, and later filed a Second Amended Complaint. Plaintiffs' Amended Complaint names as Defendants, Paul Hasty, Jr; Wallace Saunders Austin Brown & Enochs, Chtd.; ASI; ISS; Ya Deau; FirstCity; and Hiscox.

### A. The Parties

Named Plaintiff Gene Kvassay is an individual patient of the Wichita Clinic. On or before March 18, 1998, Mr. Kvassay received medical services from Wichita Clinic. Named Plaintiff Patricia McEnulty is an individual consumer of the Wichita Clinic. On or before March 18, 1998, Mrs. McEnulty purchased medical goods and services from Wichita Clinic for herself and her family. Plaintiffs Kvassay and McEnulty are residents of Wichita, Kansas.

Defendant Paul Hasty, Jr. is an attorney licensed to practice law in the State of Kansas. At all times relevant to this ac-

tion, Hasty was a shareholder, director, and employee of Defendant Wallace, Saunders, Austin, Brown & Encohs, Chtd. (Wallace Saunders). At all times relevant, Defendant Hasty was acting within the scope of his employment with Wallace Saunders. Defendant Wallace Saunders is a Kansas professional corporation engaged in the practice of the law, with its principal place of business in Overland Park, Kansas.

Defendant Armored Services, Inc. (ASI) was a Kansas corporation regularly engaged in the business of providing armored transport services. ASI had its principal place of business in Wichita, Kansas.

Defendant André Ya Deau is the president of Defendant International Security Services, Inc. (ISS), which is owned by a trust created and administered by Defendant Ya Deau. Defendant Ya Deau is employed by Defendant ISS and is the sole shareholder of ISS. Defendant Ya Deau is an individual residing in the State of Virginia. At all times relevant hereto, Defendant Ya Deau was acting within the scope of his employment with Defendant ISS.

Defendant ISS is a Virginia corporation with its principal place of business in Arlington, Virginia. Defendant ISS, a U.S. Chapter C corporation is a contractor of Hiscox, performing risk management work. ISS's principal business is a risk management consulting firm.

Defendant FirstCity Insurance Brokers Ltd. (FirstCity) is an alien insurance broker regularly engaged in the business of brokering insurance policies in the United States of America in affiliation with Lloyd's of London.

Defendant Hiscox Dedicated Corporate Member Ltd. for and on behalf of those Lloyd's Underwriters subscribing to Policy Number WA0O 1490W (Hiscox) is an enti-

ty regularly engaged in the business of underwriting insurance policies in the United States of America in affiliation with Lloyd's of London. Defendant Hiscox is based in the United Kingdom.

Defendants Hasty and Wallace Saunders will hereinafter be collectively referred to as the "Hasty Defendants." Defendants ASI; ISS; Ya Deau; FirstCity; and Hiscox will hereinafter be collectively referred to as the "WTG Defendants."

## B. The Missing Deposit Bag

In March of 1998, a deposit bag disappeared containing, among other things, cash, checks and money orders tendered to Wichita Clinic by or for the benefit of its patients, in payment for medical goods and services. The deposit bag was lost or stolen while in the possession of Defendant ASI which had been charged with safely delivering the deposit bag to Wichita Clinic's bank. Wichita Clinic subsequently demanded immediate restitution from Defendant ASI for loss of the contents of the deposit bag. Wichita Clinic contended that the missing deposit bag included, without limitation, checks received from insurance companies valued at $104,906.92, and checks received from patients valued at $31,846.04.

In March of 1998, Wichita Clinic's business was the provision of medical goods and services to its patients, such as physician services, laboratory and diagnostic services, pharmaceuticals, medical supplies, and durable medical equipment rental. In March of 1998, payment for medical goods and services would have been the only reason that Wichita Clinic would have accepted a personal check or other negotiable instrument from an individual to be applied to a patient's account.

## C. General facts relating to the relationship of the WTG Defendants

ASI purchased insurance coverage for its armored car business, by dealing directly with Marshall & Sterling[1] (Marshall), the "producing broker." Marshall produced customers for the insurance market. Marshall dealt directly with the consumer "selling insurance" to be underwritten in the London market. Although it "sold" insurance to the U.S. insured, Marshall sent ASI's insurance policy to London to the "placing broker," which found insurance underwriters to underwrite the risk. Marshall was not liable for any portion of the insurance loss.

FirstCity was the placing broker. When Marshall "sold" insurance to ASI and sent the policy to FirstCity, FirstCity then found insurance underwriters that agreed to pay the insurance proceeds should a loss occur, in return for a portion of the insurance premium. FirstCity was not liable for any portion of the insurance loss. FirstCity acted on behalf of ASI, to represent ASI in the London Insurance Market. FirstCity presented the insurance policy to Hiscox, which agreed to become the lead underwriter. Hiscox, as the lead underwriter responsible for payment on the majority of the risk, authorized actions after the reported loss.

## D. ASI's Insurance Policy

At the time it received Wichita Clinic's demand for restitution, Defendant ASI was insured through an insurance policy (the Insurance Policy) placed with "certain underwriters at Lloyd's of London." Defendant ASI obtained the Insurance Policy through Marshall, in connection with Defendant FirstCity. Hiscox purports to be the underwriter with the largest share of

---

**1.** Marshall & Sterling is a New York corporation, which sells insurance to United States consumers, and specifically has sold insur-

ance to insure armored transports. Marshall & Sterling has been dismissed from this action.

the risk on the Insurance Policy. Other underwriters also participated in the risk. The identities of the underwriters insuring the risk on the Insurance Policy are not disclosed in the policy document, nor in the "Cover Note." The identities of the underwriters other than Defendant Hiscox were never disclosed to Defendants Hasty or Wallace Saunders, Wichita Clinic, or Plaintiffs prior to the filing of this lawsuit.

Upon receiving Wichita Clinic's demand for restitution, ASI notified Marshall thereof in connection with ASI's claim for indemnity under its Insurance Policy.

Shortly after the March, 1998 loss of the deposit bag, Defendant Hiscox engaged Defendant André Ya Deau, of Defendant ISS, to investigate the loss, to adjust the claim, and to cause a "check reconstruction," *i.e.*, to facilitate recovery of lost payments from the makers thereof. Ya Deau and ISS were contract employees, working solely on behalf of Hiscox.

Defendant Ya Deau communicated primarily with Defendant FirstCity's Claims Department with regard to the above-described engagement. Defendant ISS' invoices for Defendant Ya Deau's services were submitted to Defendant FirstCity. Defendant FirstCity obtained payments for those invoices from Defendant Hiscox and other underwriters; Defendant FirstCity then transferred those funds to Defendant Ya Deau.

During the course of his engagement in the matter involving Wichita Clinic and ASI, Defendant Ya Deau made recommendations as to what Defendant Hiscox, the lead underwriter should or should not do, and there were no occasions when Defendant Hiscox rejected his recommendations.

### E. "Check Reconstruction"

On June 4, 1998, Defendant Ya Deau sent correspondence to Defendant ASI recommending that "Wichita Clinic needs to start reconstruction." On June 9, 1998,

Defendant FirstCity confirmed approval of said recommendation. Defendant FirstCity's Claims Department further indicated that the underwriters were not going to pay any indemnity for Defendant ASI for the claims of Wichita Clinic, if at all, until after Wichita Clinic had completed check reconstruction.

In accordance with the above, Defendant Ya Deau initially required Wichita Clinic to attempt to "reconstruct" any missing checks by seeking replacement payments from the makers thereof. Defendants Ya Deau and ISS also encouraged Wichita Clinic to turn insurance companies that refused to replace checks in to the Kansas Insurance Commissioner's Office. In so doing, Defendant Ya Deau advised Wichita Clinic that if it refused to comply, it would be in breach of its contract with ASI, which provided, in pertinent part:

> [Wichita Clinic] agrees, if feasible, to maintain a complete record as to maker, bank and amount of all checks placed in any shipment given to [ASI] and in case of loss, to promptly, diligently and completely cooperate with [ASI] in the identification and replacement of lost, destroyed or stolen checks which had been contained in any such shipment. Complete cooperation shall include *requests by [Wichita Clinic] to makers of the missing checks to issue duplicates and in the event the makers refuse to do so, then to assert all its legal and equitable rights against said makers or to subrogate such rights to ASI and its assigns.* (Emphasis added).

Defendant Ya Deau initially agreed that the makers of any lost checks would be allowed to deduct the cost of any stop payment orders from their replacement payments to Wichita Clinic. Deductions for stop payment orders were a "reconstruction expense," and were to be borne by Armored Service's insurers. Defen-

dants Ya Deau and ASI also initially agreed that Wichita Clinic need not seek replacements for missing checks in the amount of Twenty Dollars ($20.00) or less, because the costs of the stop payment orders on those checks would likely equal or exceed the amounts owing. However, parties are in dispute about what "replacements" were being waived. Plaintiffs allege that the agreement concerned replacement payments. Defendants allege that the agreement concerned replacement checks.

Wichita Clinic demonstrated reluctance to pursue "check reconstruction," but ultimately complied. Over the next several months, Wichita Clinic requested that certain individuals make replacements to Wichita Clinic for the amounts alleged to have been lost with the deposit bag, less the cost of any stop payment order. Defendant Ya Deau subsequently urged Wichita Clinic to notify the individuals who did not make replacements that if such payments were not received, their accounts would be placed for collection with an attorney or collection agency. Wichita Clinic refused to threaten or sue the individuals from whom it had not received replacements.

### F. "Local Attorney for Debt Collection"

On or about November 6, 1998, Defendant Ya Deau sent correspondence to Defendant FirstCity advising, in pertinent part:

The check reconstruction effort is not proceeding well. You may recall that there was a total of $ 146,79.30 [2] in reconstructible checks included in the stolen deposit. As of November 4, 1998, the Wichita Clinic has collected $20,788.29 from its patients, $22,896.28 from insurance companies and approximately $1,200 from company clients.

The checks reconstructed total $44.884.57 [sic].

The Wichita Clinic in my assessment has cooperated fully with the reconstruction process and has sent out multiple letters and made phone calls to those who issued the larger checks. [Wichita Clinic] is becoming frustrated and does not know what to do next.

*It is recommended that we become more aggressive.* With Underwriters' permission there are two steps I would like to see initiated. The first is to turn the approximately $80,000 due from Insurance Companies over to the Kansas Insurance Commission. The second is to *retain a local attorney for debt collection. The clients of the Wichita Clinic cannot show that they have paid and there is a basis for action.*

If the clinic turns the insurance checks over to the insurance commission this will not cost Underwriters anything and should prompt rapid payment. *I would appreciate the authorization to involve the attorney at some future date as appropriate.*

ISS believes a local attorney would be appropriate. ISS does not have any one [sic] in particular in mind. My thinking is to talk to the clinic and arrange to use whoever it uses and to reimburse the clinic for the cost.

It *may become necessary to reimburse the clinic for the funds that are outstanding and assume their rights under law.* The clinic has not requested this yet and continues to make use of the assured's services. Pressure in this direction can be expected as the year draws to a close. (Emphasis added).

On or about November 19, 1998, Defendant FirstCity sent correspondence to Defendant Ya Deau stating, in pertinent part:

---

**2.** The figure reads $ 146,79.30 in Pls. Mem. in Supp. of Pls. Mot. for Partial Summ. J. ¶ 31.

[T] he leading Underwriter has ... *agreed with your recommendation that a local attorney be retained for debt collection.* (Emphasis added).

### G. Wichita Clinic's Offer to Subrogate or Assign

On or about December 17, 1998, Wichita Clinic sent correspondence to Defendant Ya Deau providing, in pertinent part:

Over the past several months, employees of the Wichita Clinic, P.A. have been in the process of check reconstruction for the Clinic deposit which was lost while in the possession of Armored Services, Inc.

To date, we have recovered payments of $ 76,054.11, out of the total that was lost. Our staff has been diligent and used their best efforts to recover as much of the lost deposit as possible. We are now at a point where we need to bring this issue to closure.

We therefore wish to advise you that *Wichita Clinic, P.A., is prepared to subrogate or assign all rights it has against the makers of the unrecovered checks to Armored Services, Inc. and/or any entity to whom Armored Services, Inc., assigns its rights.* Wichita Clinic must insist on the remaining outstanding balance of the unrecovered checks *[i.e.,* $72,213.66]. (Emphasis added).

On or about December 22, 1998, Defendant Ya Deau rejected Wichita Clinic's offer of December 17, 1998, and encouraged Wichita Clinic to hire an attorney or collection service to pursue debt collection efforts against its customers. Defendant Ya Deau testified regarding his above-referenced letter as follows:

Q. [T]he essential position that you're taking with this proposed letter is, we are not going to pay the $72,000 you asked for; you need to engage in further check reconstruction efforts, right?

A. Yes.

Q. And one of the tools available to you to perform that activity is to get an attorney or a debt collection agency to go after the people who wrote the checks.

A. Yes.

### H. Wichita Clinic's Insurer

Between December of 1998 and April of 1999, Wichita Clinic was also seeking to recover the loss it sustained in connection with the missing deposit bag from its own insurer, St. Paul Fire and Marine Insurance Company (St. Paul).

### I. Exhibits "C" and "D"

At St. Paul's request, Wichita Clinic prepared and delivered to St. Paul two lists reflecting the amounts of payments alleged to have been lost but not replaced, along with the name and address of the person responsible for each patient account for which a payment had been lost in the missing deposit bag.

The lists identified in the paragraph, directly above, were later obtained by Hasty and designated by Hasty as Exhibits "C" and "D." For convenience, these lists will hereinafter be referred to as "Exhibit C" and "Exhibit D," respectively. "Exhibit C" had been filtered by Wichita Clinic to include only those individuals responsible for accounts for which a payment in excess of Twenty Dollars ($20.00) had been lost and not replaced. "Exhibit D" reflected only those individuals responsible for accounts for which a payment of Twenty Dollars ($20.00) or less had been lost and not replaced.

Exhibit C reflected the names of 133 individuals, including the *Kvassay* class members, having a mean average alleged obligation to Wichita Clinic of approximately $82.07. The total amount of the payments alleged to have been lost for the

accounts listed on Exhibit C was $10,914.92 ($10,460.78 in checks, $298.00 in money orders, $131.60 in cash, and $24.54 in undisclosed form).

Exhibit D reflects the names of 602 individuals, including each and every *Stark* class member[3], having alleged obligations to Wichita Clinic ranging from ($0.06 to $20.00), with a mean average of approximately $11.85. The total amount of the payments alleged to have been lost for the accounts listed on Exhibit D was $7,136.70.

In April of 1999, Wichita Clinic and St. Paul entered into an agreement by which Wichita Clinic received partial payment from St. Paul for its remaining loss, as "a loan, without interest, repayable only in the event and to the extent of any net recovery or net settlement [St. Paul] may make or secure from any person, persons, corporations or other parties causing or liable for the loss .…" Wichita Clinic agreed that it would, if required by St. Paul, commence and prosecute suit against such of those persons or entities through whose negligence or other fault the loss was caused, or who may be responsible therefor. Such litigation would be brought in the name of Wichita Clinic, but at the expense of, and under the direction of, St. Paul.

In or around April of 1999, St. Paul engaged Bernard L. Balkin ("Balkin"), of Sandier, Balkin, Hellman, Weinstein & Witten, P.C., to prosecute the claim of Wichita Clinic for recovery of its remaining losses from the missing deposit bag (*i.e.* the monies loaned to Wichita Clinic by St. Paul). On or about April 16, 1999, Balkin sent correspondence to ASI demanding immediate payment of $64,905.08 ($58,056.45 for unrecovered payments + $6,848.63 for costs of "reconstruction" efforts) as restitution for the remaining loss

suffered by Wichita Clinic in connection with the missing deposit bag. ASI and its insurers refused to pay, claiming that ASI' liability for missing checks was limited to $15,000 under the contract between the parties.

## J. Appointment of the Hasty Defendants

On or about May 19, 1999, Defendant Ya Deau forwarded Mr. Balkin's letter of April 16, 1999, to Defendant FirstCity, and suggested that an attorney be appointed or at least designated for appointment in the event that litigation would he commenced. On or about May 21, 1999, Defendant FirstCity's Claims Department responded to Defendant Ya Deau's fax of May 19, 1999, and advised: "when and if suit is filed, the Leader has asked this case to be referred to Paul Hasty of Wallace Saunders, Austin, Brown, and Enochs to protect Underwriter's interests." (App. 28: fax correspondence from Defendant FirstCity to Defendant Ya Deau, dated May 21, 1999).

## K. The Related State Action

On June 17, 1999, Balkin filed an action on behalf of Wichita Clinic against ASI in the District Court of Sedgwick County, Kansas, in an action entitled *Wichita Clinic, P.A. v. Armored Services, Inc.,* Case No. 99 C 1853 (the Related State Action). This suit was based on allegations by the Clinic that ASI had lost a deposit bag containing cash, money orders, and checks made payable to the Clinic.

On or about July 30, 1999, the Hasty Defendants were engaged "to assist in the claims process and defend [Armored Services] .…" Defendant Ya Deau forwarded his entire file to Defendant Hasty, includ-

---

**3.** The court considers the *Stark* class members' case in a companion action entitled

*Douglas C. Stark v. Paul Hasty, Jr. et. al.,* Civil Action No. 00–1500–JTM.

ing Ya Deau's prior letters encouraging the use of an attorney or collection agency to pursue debt collection[4] efforts against the makers of lost checks.

During the course of his engagement, Defendant Hasty was instructed by, and generally took his directions from, Defendant Ya Deau, although he also received occasional instruction from Defendant FirstCity. Defendant Hasty testified on this issue as follows:

Q. Well, who did you take direction from during your representation in the underlying litigation?

A. Generally from Mr. Ya Deau, although I did get a call or two from a fellow in London, who I think was Harness or Harmess but I can't remember his name. I would have to look at my file.

Q. Clark Hanness?

A. Clark something, yes.

### L. "Aggressive" Reconstruction Efforts

On August 4, 1999, Defendant Hasty sent correspondence to Defendant FirstCity's Claims Department advising, in pertinent part:

I am in receipt of Mr. Ya Deau's letter of July 30, 1999 and the enclosures relative to [this] matter. I have reviewed the material received from him

Armored Services, Inc. has insisted that the Wichita Clinic take steps to reconstruct the checks. Wichita Clinic has taken some steps, but *has not been very aggressive.* It claims that it has losses of about $65,000. *The Clinic does not want to take any more steps to try to have the checks reconstructed because it is concerned it will irritate its patients and their insurance companies.*

As the enclosure indicates, I am asking Wichita Clinic's counsel to give us the list [of patients and insurance earners whose checks are alleged to have been lost]. *We are entitled to bring all of those patients and insurance carriers into the case. I have a feeling that is going to cause renewed efforts by Wichita Clinic to get these checks reconstructed. Hopefully, it will make the claim settle.* (Emphasis added).

Defendant Ya Deau received the above-referenced letter from Defendant Hasty and interpreted the last few sentences as Defendant Hasty "trying to... pressure and negotiate settlement." Defendant Ya Deau has admitted that the Hasty Defendants' pursuit of the individual makers of the checks was consistent with Defendant Ya Deau's own proposals.

Anthony Durnford, claims underwriter for Defendant Hiscox, reviewed Defendant Hasty's letter of August 4, 1999, discussing pursuit of Wichita Clinic's patients in an effort to cause the claim to settle. Mr. Durnford marked the specific paragraph containing Defendant Hasty's proposal by making a pen mark down the side of the paragraph; he wrote "NOTED AND AGREED," on the face of the document; and he made a mark, known as a "scratch," which is an initial representing the syndicate.

On August 11, 1999, Defendant FirstCity's Claims Department sent correspondence to Defendant Hasty confirming approval of his recommendation by stating, in pertinent part:

Thank you for your letter dated 4 August 1999 together with the enclosures concerning [this] matter.

---

**4.** In Defendant Ya Deau's deposition testimony, plaintiff's counsel stated that it was understood that Defendant Ya Deau was "operating under [his] understanding of what debt collection means and not what a statute called the Fair Debt Collection Practices Act may mean." Ya Deau Deposition 115:7–12, Hasty Defs. Supplemental App. Ex. 24.

Please be advised that the leading Underwriter has noted the contents and *agrees with your proposed course of action.* (Emphasis added).

On September 1, 1999, the Hasty Defendants filed an Answer and Third Party Petition on behalf of ASI in the Related State Action to recover the amounts of checks alleged to have been lost or stolen in the missing deposit bag. Naming approximately one hundred and thirty-three (133) individuals listed on Exhibit C (including the *Kvassay* class members). However, Defendants stress that as no summons were issued at any time to any of the third-party Defendants, no actions were "commenced" against those parties. Defendant Hasty also took the deposition of Plaintiff McEnulty and attempted to take the deposition of Plaintiff Gene Kvassay.

## M. The *Kvassay* Letters

On September 2, 1999, the Hasty Defendants sent one or more form letters to each of the individuals identified on Exhibit C, including the *Kvassay* class members, through the United States mail. The letter was sent on Defendant Wallace Saunders letterhead. The Hasty Defendants mailed the *Kvassay* Letters approximately eighteen (18) months after the checks were allegedly lost with the deposit bag. However, the *Kvassay* Letters do not mention the date the subject checks were alleged to have been issued or lost.

The Hasty Defendants enclosed with each of the *Kvassay* Letters a copy of the Answer and Third–Party Petition from the Related State Action. The Hasty Defendants also enclosed with each of these letters a copy of Exhibit C, reflecting the name, address, and amount of the lost checks of each of the 133 individual addressees.

Each of the *Kvassay* letters stated:

Re: *Wichita Clinic P.A. v. Armored Services, Inc. v. [Name of addressee],* et al.

Case No: 99–C–1851

Our File No.: 79,631

Dear Third Party Defendant:

I enclose a copy of a lawsuit that has been filed in the District Court of Sedgwick County, Kansas. This office represents Armored Services, Inc. The Wichita Clinic, P.A. claims that an armored car shipment was lost and that the shipment contained a check or checks written by you to the Wichita Clinic. The *suit against you* is to recover the *amount* of the lost or stolen check or checks tendered to the Wichita Clinic, P.A.

Please send me a replacement check or proof that you have previously replaced your check or checks within ten (10) days from the date of this letter. *If I do not hear from you, the Court will issue a Summons for you as a third-party Defendant.*

> Very truly yours,
>
> Paul Hasty, Jr.
>
> For the Firm

(Emphasis added).

In the *Kvassay* letters, the Hasty Defendants did not advise the addressees to deduct the cost of any stop payment orders as had previously been agreed between Defendants ASI/Ya Deau and Wichita Clinic. However, Defendants stress that the previous agreement between Ya Deau and the Clinic would not have required the deduction of stop payment charges 18 months after the checks were lost.

At the time Defendant Hasty mailed these letters, neither the Plaintiffs nor any of the class members owed money to any of the Defendants as a result of the disappearance of the deposit bag and its con-

tents, and none of the Defendants were creditors of the Plaintiffs or class members. However, Plaintiffs stress that Defendant Hasty alleged that these individuals owed an obligation to pay money to the Wichita Clinic, as replacement for payments lost with the missing deposit bag.

As of September 2, 1999, the records of Wichita Clinic did not indicate that the Plaintiffs owed any money, or had any past-due or in-default account, in connection with the services for which those persons had paid with their lost checks. Plaintiffs' obligations to the Clinic, those obligations paid by their lost checks were not overdue or in default.[5]

Defendant Hasty forwarded a copy of the form template used to generate the *Kvassay* Letters to Defendant Ya Deau, along with a list of names and addresses and a post script stating: "A letter was sent to each third-party Defendant. See attached list of names and addresses."

On September 10, 1999, Defendant Hasty sent correspondence to Defendant FirstCity's Claims Department stating, in pertinent part:

> Our Answer and Third Party Claim has been filed. I assume a copy has reached you by now I anticipate that we will be hearing very quickly from many of the third party Defendants.

On September 14, 1999, Anthony Durnford, of Defendant Hiscox, noted (reviewed and acknowledged) Defendant Hasty's letter to Defendant FirstCity of September 10, 1999. Plaintiff alleges but does not prove that Durnford approved the document.

Named Plaintiffs Gene Kvassay and Patricia McEnulty each received a *Kvassay* letter, along with an enclosed Answer and Third Party Petition from the Related

State Action and an enclosed copy of Exhibit C, reflecting the names, addresses, and amount of the lost checks of each of the other addressees.

A large number of the recipients of the *Kvassay* Letters called Wichita Clinic and expressed and exhibited consternation, embarrassment, anger, indignation, and/or confusion resulting therefrom. The *Kvassay* letters caused a significant disruption in Wichita Clinic's business, and they adversely effected Wichita Clinic's relationship with affected patients. A large number of the recipients of the *Kvassay* Letters also called or wrote to the Hasty Defendants.

On or about September 14, 1999, Defendant Hasty sent correspondence to Balkin stating:

> I anticipate that your client and counsel are all going to be receiving a number of contacts from the third-party Defendants. I ask that I be notified immediately with regard to any third-party Defendant that replaces one of the negotiable instruments. I have notified all the third-party Defendants that I will ask the Court to issue a Summons for them if they do not replace the respective instruments by September 12, 1999. I would like to dismiss as many of them as possible before having the respective Summons issued.

Even where an individual established that he had paid by money order, the Hasty Defendants persisted in demanding a replacement payment from him. Although it had been approximately eighteen months since the money order had been issued, Defendant Hasty testified that he did not take into consideration the difficul-

---

**5.** Plaintiffs attempted to controvert this paragraph, but failed because the evidence cited

does not support their argument.

ty or expense necessary to obtain a replacement money order.

### N. Wichita Clinic's Reaction to the *Kvassay* Letters and Related State Action

On or about September 29, 1999, Wichita Clinic sent correspondence to Patricia McEnulty in the Related State Action providing as follows:

We at the Clinic were very distressed to learn that Armored Services and their lawyers decided to bring you into this lawsuit. Certainly, you had no involvement in Armored Services' loss of our bank deposit and it is unfortunate that Armored Services has decided to include you in this case. It was our intention that this lawsuit only involve Armored Services.

We value our patients and regret any inconvenience this has caused. We are hopeful this matter can be resolved without additional inconvenience to you, but we do not have the ability to control the actions taken by Armored Services. We can provide you with information concerning your account at the clinic. If you have questions on the status of your account, please call Rose Murdock at 689–9811. Rose is aware of the claim made by Armored Services and will help with questions you have concerning your account with regard to Armored Services' claim.

On October 21, 1999, the Sedgwick County District Court found that ASI was a common carrier pursuant to K.S.A. § 66–304 and that, as a matter of law, the terms of the ASI/Clinic contract limited ASI's liability, in the case of lost checks, to reconstruction expenses of $15,000. The court found that this contractual limitation of liability, in the case of lost checks, was unenforceable in Kansas, being contrary to the provisions of K.S.A. § 66–304.

On November 22, 1999, Defendant Hasty sent correspondence to Balkin providing, in pertinent part:

For some reason I don't understand, you quit responding to my inquiries concerning the status of a number of these accounts. You indicated to me, early on, that your client didn't take aggressive action to get the checks replaced because your client was concerned about patient relations. Regardless of whether that was the proper approach, I can't imagine it's good patient relations for me to serve process on your client's patient when the instrument has been replaced and I have a summons served because you have not told me that there has been payment.

### O. The First *Stark* Letters

On December 10, 1999, the Hasty Defendants sent one or more form letters (*Stark* Letters) to each of the approximately six hundred and two (602) individuals on Exhibit D, including the *Stark* class members, through the United States mail.

The Hasty Defendants mailed the *Stark* Letters approximately twenty-one (21) months after the checks were allegedly lost with the deposit bag. The *Stark* Letters do not mention the date the subject checks were alleged to have been issued or lost. However, Defendants stress that a copy of the Wichita Clinic's petition was enclosed with the letter, and the pleading states the date the subject checks were alleged to have been lost.

The Hasty Defendants enclosed with each of the *Stark* Letters more than forty (40) pages of legal pleadings and lists, including the Petition and Answer and Third–Party Petition from the Related State Action, and Exhibits C and D, reflecting the names, addresses, and amount of payments [that had been lost] of approximately seven hundred and thirty–five

(735) individuals, combined (including each of the *Kvassay* and *Stark* class members).

Each of the *Stark* Letters stated:

Re: *Wichita Clinic, P.A. v. Armored Services, The, v. [Name of addressee]*

Case No: 99–C–1851

Our File No. 79,631

Dear [Name of addressee]:

I enclose a copy of a Petition that was originally filed in the District Court of Sedgwick County, Kansas by Wichita Clinic. I also enclose a copy of the original Answer and Third–Party Petition filed by Armored Services. I also enclose a document labeled "Exhibit D." This office represents Armored Services. Plaintiff claims that a bag was delivered by Wichita Clinic to Armored Services containing a number of checks. Somewhere between the Clinic and the bank, the bag was lost. The Clinic has filed suit against the Armored Car Service as a result of loss of the bag. The Clinic has claimed that a check or checks from you were in the bag.

I did not have Exhibit D when we filed the original third-party action. *I ask that you find your name on Exhibit "D" and that you send me a check in the proper amount, made payable to the Wichita Clinic, within ten (10) days from the date of this letter. If I receive your check, I will not take steps to amend the third-party claim to include you in the lawsuit. However, if you do not replace the check or checks immediately, you may be added to the lawsuit as a third-party Defendant.*

Since it appears that the check you wrote the Clinic was never presented at your bank and honored, suit may be filed against you to recover the *amount* of the check.

Very truly yours,

Paul Hasty, Jr.

For the Firm

(Emphasis added). The "Re" section of each of the *Stark* Letters reflects the addressee's name in the case name of the Related State Action.

In the *Stark* letters, Defendant Hasty did not advise the addressees to deduct the cost of any stop payment orders as had previously been agreed between Defendants ASI/Ya Deau and Wichita Clinic. However, Defendants stress that the previous agreement between Ya Deau and the Clinic would not have required the deduction of stop payment charges 18 months after the checks were lost.

In the *Stark* letters, Defendant Hasty did not advise the addressees of the agreement between Wichita Clinic and Defendant Ya Deau/ASI, Inc. referred to above *(i.e.,* that these individuals need not be pursued because the costs of the stop payment orders on those checks would likely equal or exceed the amounts owing).

Douglas Stark received a *Stark* letter, along with the Petition and Answer and Third–Party Petition from the Related State Action, and Exhibits C and D, reflecting the names, addresses, and amount of the lost checks of approximately seven hundred and thirty-five *(735)* individuals, combined (including each of the *Kvassay* and *Stark* class members).

Defendant Hasty forwarded a copy of the form template used to generate the *Stark* letters to Defendant Ya Deau and Defendant FirstCity's Claims Department, along with list of names and addresses and a note stating: "The attached letter was sent to each individual listed on the attached chart."

On or about December 10, 1999, Defendant Hasty also sent correspondence to Defendant FirstCity's Claims Department advising as follows:

Since we received responses to almost *50%* of the individuals who wrote checks

to the Clinic, without serving process on any one [sic], I thought it was worth one letter to all of the people we did not originally sue, *just to see if we could get them to replace the checks.* The Clinic made no effort to have the checks replaced because the checks were small and did not merit a fee to the bank to stop payment. After such a longtime, I don't think its necessary to stop payment. *I will not proceed against any of the persons who received the letter unless I hear from you that you want me to do so,* but we can obviously take credit for any *money collected with the letter.* (Emphasis added).

Anthony Durnford, claims underwriter for Defendant Hiscox, reviewed Defendant Hasty's letter of December 10, 1999. Mr. Durnford wrote "NOTED AND AGREED," on the face of the document, and he made the Hiscox "scratch" on the face of the document.

At the time the Second *Stark* Letters were mailed, Defendant Hasty did not intend or expect to take any formal legal action against any of those persons unless advised to do so by Defendant FirstCity.

On December 23, 1999, Defendant FirstCity's Claims Department sent fax correspondence to Defendant Hasty confirming approval of the *Stark* Letters as follows:

Thank you for your letter dated 10 December 1999 advising as to the current status of this circumstance.

*The leading Underwriter has noted your comments and agreed with your recommendations.* (Emphasis added).

**P. Wichita Clinic's Personal Counsel**

On or about December 14, 1999, Jay Fowler, Foulston Siefkin L.L.P., sent fax correspondence to Defendant Hasty, stating as follows:

On behalf of the Wichita Clinic, P.A., I am responding to a letter written by you

dated December 10, 1999, directed to patients of the Wichita Clinic. The letters were apparently sent to patients whose checks were lost by your client where the total of each check was $20 or less. This letter is to demand that you immediately cease making demands on those Clinic patients whose checks fall within the $20 or less category and that you immediately advise all patients previously contacted to disregard your correspondence of December 10, 1999.

It was previously agreed between Armored Services, Inc., and its insurance earner adjuster and the Wichita Clinic that no action would be taken to recover anything from those persons providing checks in the amount of $20 or less. The Wichita Clinic was advised by ASI or its insurance carrier that the value of those checks would be paid. This agreement was made because the cost of stopping payment and obtaining replacement on those checks would be greater than the amount of the checks.

Your communication with the Wichita Clinic Patients has interfered with the Clinic's relationship with those patients and has caused considerable disruption. Your correspondence to the Wichita Clinic's patients also appears to have violated the Fair Debt Collection Act [sic]. The Wichita Clinic reserves all of its options in that regard. In the meantime, please cease and desist all debt collection communications to persons referenced on "Exhibit D" as identified in your correspondence and immediately provide letters of retraction to all persons to whom the collection correspondence was directed.

**Q. The Second *Stark* Letters**

On or about December 14, 1999, the Hasty Defendants sent an additional mailing of form letters (Second *Stark* Letters)

to each of the individuals on Exhibit D, including the *Stark* class members, extended the compliance period to thirty (30) days from receipt of the Second *Stark* letter and providing a validation procedure (which Plaintiffs contend did not comply with the FDCPA).

Defendant Hasty sent the Second *Stark* Letters to comply with the FDCPA, if compliance was necessary. Defendant Hasty testified regarding his decision to send the Second *Stark* Letters, to wit:

Q. You sent a letter to all the class members on December 14, 1999 via regular mail?

A. I did.

Q: In the letter you attempted to comply with the Fair Debt Collection Practices Act, isn't that right?

A. If compliance was required, that's right.

Q. That was your intent in drafting that wave of letters that you sent out four days after you sent 604 other letters.

A. My intent was with—you're talking about [the Second *Stark* Letters]. My intent in [the Second *Stark* Letters] was to comply with the act, if the claim fell within the act.

Q. Had you done some research or something to spark your interest in the Fair Debt Collection Practices Act at that time?

A. Something, yes.

Q. What was it you did?

A. This—I think December 10, if that's the date of the letter, I think that's a Friday and I, over the weekend that issue occurred to me and I left a note for Mark Bodine that Monday because he is our resource person and asked him—told him what the situation was. Well, I left a note for him. Of course, he wasn't there. When became in I asked him if this scenario fit the Fair Debt Collection Practices Act and he

said no, didn't think so, but he said if there's a possibility, act like it did and so I told him about the letter I had sent on Friday and he said, "You have got five days to fix it; just write another one," so I did. And just so happened that went out before I got [the December 14, 1999, letter] from Mr. Fowler.

Each of the Second *Stark* Letters provided:

Re: *Wichita Clinic, P.A. v. Armored Services, inc, v. [Name of addressee]:*

Case No: 99–C–1851

Our File No. 79,631

Dear [Name of addressee]:

As you know, I wrote to you by letter dated December 10, 1999 with regard to the above-referenced matter. If you dispute the validity of the claim, or any portion thereof, please contact me within thirty (30) days from the receipt of this letter. If you notify me within thirty (30) days that the claim, or any portion thereof is disputed, I will mail verification of the claim to you. If I have not heard from you within thirty (30) days, the claim will assumed [sic] to be valid. I will wait thirty (30) days, to give you time to respond, *before taking any action against you.*

This firm has been retained by Armored Services Inc. with regard to this matter and *it is taking all necessary steps to obtain replacement instruments for the instruments(s) shown on Exhibit D* to my letter of December 10, 1999.

Very truly yours,

Paul Hasty, Jr.

For the Firm

(Emphasis added). A large number of the recipients of the *Stark* Letters and/or the Second *Stark* Letters called Wichita Clinic and expressed and exhibited consternation, embarrassment, anger, indignation, and/or

confusion resulting therefrom. The *Stark* Letters and the Second *Stark* Letters caused a significant disruption in Wichita Clinic's business, and they adversely effected Wichita Clinic's relationship with affected patients.

Many of the recipients of the *Stark* Letters and/or the Second *Stark* Letters contacted the Hasty Defendants and expressed and exhibited consternation, embarrassment, anger, indignation, and/or confusion resulting therefrom.

### R. Wichita Clinic's Reaction to the *Stark* Letters and Second *Stark* Letters

On December 15, 1999, in response to the flood of patients who called in response to the *Stark* Letters and/or the Second *Stark* Letters, Wichita Clinic generated this letter.

Dear Patient:

We recently learned that you have been contacted by an attorney, Paul Hasty, Jr., who represents Armored Services, Inc. Wichita Clinic has filed a lawsuit against Armored Services, Inc., to recover losses incurred by the Clinic when Armored Services lost a bank deposit bag belonging to the Clinic. The bank deposit bag contained cash and checks. Armored Services employees lost the money when delivering the Clinic's deposit to the bank. Unfortunately, your check was one of the checks lost by Armored Services.

We at the Clinic were very distressed to learn that Armored Services and their lawyers decided to bring you into this situation. They had previously assured us that you would not be asked to replace your lost check or be contacted. Our Wichita Clinic attorney has contacted Mr. Hasty and demanded that he immediately cease making demands on you for replacement of your lost check. Certainly, you had no involvement in Armored Services' loss of our bank deposit and we find it deplorable that the attorney has contacted you in violation of our previous agreement with Armored Services. It was our intention that this lawsuit only involve Armored Services.

We value our patients and regret any inconvenience this has caused. We are hopeful this matter can be resolved without additional inconvenience to you. If you have questions on the status of your account, please call Rose Murdock at 689–9811. Rose is aware of the claim made by Armored Services and will help with questions you may have.

Again, the Clinic values your relationship with us as a patient. We look forward to responding to any questions you may have concerning this matter.

Plaintiffs allege, but fail to prove that the letter was sent to the addressees of the *Stark* Letters and/or the Second *Stark* Letters.

On December 21, 1999, Defendant Hasty sent correspondence to Jay Fowler, providing, in pertinent part:

I am in receipt of your letter of December 14, 1999.

What we've heard from several people on "Exhibit D" is that they did not have an instrument made payable to the Clinic in March of 1998. One of them has told them that contact with the Clinic has resulted in the Clinic's statement that they have no confidence that Exhibit D is accurate. It seems to me that if the plaintiff is going to sue the Defendant based on Plaintiffs claim that the plaintiff lost over $7,000 in instruments as reflected in Exhibit D, then the Defendant has a number of questions that need to be answered and the right to collect on those claims.

I certainly understand that the Clinic did not make efforts to collect from the

patients on Exhibit D and I don't anticipate making any claim that the Clinic violated the contract by failing to take any steps to collect on those particular instruments. The Clinic was not asked to take steps on those instruments because of the timing involved. However, at this point, the instruments are almost two years old. They are obviously very stale. Armored Services is now in a much different position and it is not necessary to stop payment on the instruments.

Do you disagree that the persons on Exhibit D are witnesses? If you don't disagree with that, then I wonder about your request that we not communicate with them. It seems to me that you'll have to agree that we have the right to communicate with persons on Exhibit D as long as your client is making claim against the Defendant based on your clients' claim that instruments from those persons were lost in the shipment.

On December 23, 1999, Amy Lemley, of Foulston Siefkin L.P., entered her appearance for Wichita Clinic in the Related State Action. On December 27, 1999, Amy Lemley, as personal counsel for Wichita Clinic, sent correspondence to Defendant Hasty stating, in pertinent part:

I am in receipt of your letters dated December 21 and 22, 1999 to my partner, Jay Fowler.

I have been advised by my client that Jeff Sparks, owner of Armored Services, Inc., recently confirmed in a telephone conversation with Mr. Steve Perkins [sic, should have been Frank Cordon] at the Wichita Clinic, that the parties entered into an agreement that no collection efforts would be pursued in this matter for amounts less than $20.00. The Clinic relied on this agreement.

Your communications to the patients in this class of patients, dated December 10, 1999, and December 14, 1999, are in clear violation of the agreement between Wichita Clinic and Armored Services. These violations have caused substantial harm to the Clinic's business relationship with the patients in this class. You also violated the Fair Debt Collection Practices Act with your improper communications to the members of this class.

Your letters in response to Mr. Fowler do not respond to his direction that you cease and desist all "debt collection" communications to the person referenced in "Exhibit D" as identified in your correspondence. Likewise, you have ignored his request that you provide letters of retraction to all persons to whom the "collection" correspondence was directed.

In fact, it is obvious that immediately upon receiving his written communication, you intentionally contacted the persons named in "Exhibit D" via your correspondence to that class of persons, dated December 14, 1999.

A review of your correspondence indicates that you were aware of the parties' agreement on or before October 4, 1999. Your contention of December 21, 1999, that Armored Services is now in a different position, and that you have a right to contact the members of the class of patients listed on "Exhibit D" as witnesses is without merit. The persons in that class of patients are not witnesses to any issue in this lawsuit because of the previous agreement between the parties. It appears that you are proceeding in outlaw disregard of agreements between your client and mine, and have made no effort to confirm with your client the existence of the agreement.

If you do not comply with the requests made in Mr. Fowler's letter to you dated December 14, 1999, the Clinic will seek relief from the Court, including a claim

for attorney's fees. Your deadline for compliance is the end of the business day, December 30, 1999.

On January 5, 2000, Defendant Hasty sent correspondence to Amy Lemley, personal counsel for Wichita Clinic, advising as follows:

I am in receipt of your letter of December 27, 1999.

As I indicated to Mr. Fowler, it is my understanding that there was an agreement that it would not be necessary for the Clinic to try to recover on the instruments for less than $20.00 because of the costs of stopping payment on the instruments. It is my understanding that's the reason the Clinic did not take any steps with regard to those matters. Please let me know what you believe was a violation of the Fair Debt Collection Practices Act.

Your assumption that my letter of December 14, 1999 was written after the communication from Mr. Fowler is incorrect.

### S. Wichita Clinic's Motion for Protective Order

On January 3, 2000, Amy Lemley, as personal counsel for Wichita Clinic, filed a Motion for Protective Order in the Related State Action, requesting, among other things, that the Court order the Hasty Defendants to "immediately cease and desist initiating any and all contact with all persons in the class of persons named in 'Exhibit D' [*e.g.*, the *Stark* class members] ... until further order of the Court." Wichita Clinic contended, as a basis for the relief it requested, that "the violations of the Fair Debt Collection Practices Act... damaged [Wichita Clinic], and further damaged the class of persons named in 'Exhibit D.'"

On January 11, 2000, Defendant Hasty sent correspondence to Amy Lemley, providing, in pertinent part:

I am in receipt of [Wichita Clinic]'s Motion for Protective Order.

Many of the persons on Exhibit D have indicated that there could not possibly have been an instrument in the bag from them. I have tried to keep Mr. Balkin apprised [sic] of those contacts as they have been received. I have inquired of him whether plaintiff is still including in its claim against Defendant a claim for $7,155.44 based on Exhibit D, and Mr. Balkin has not responded. I am therefore assuming that plaintiff is still including that in Plaintiffs claim. That being the case, do you seriously contend that these people aren't witnesses and we shouldn't contact them? On the other hand, if there's just been a delay in Mr. Balkin getting back to me and there is no claim against Defendant based on Exhibit D, then it seems to me we have an entirely different situation and I'm certain that we will rethink Defendant's position as to whether there's any need to contact any of these people. I'll agree, until the Court rules on your Motion, to undertake *no further collection activity* with regard to the persons on Exhibit D and the instruments listed there. (Emphasis added).

On January 25, 2000, third-party Defendant (named Plaintiff) Patricia McEnulty filed her Answer denying liability in the Related State Action. On January 26, 2000, third-party Defendant (named Plaintiff) Gene Kvassay filed his Answer denying liability in the Related State Action. On January 28, 2000, Defendant Hasty filed Notices of intent to take the depositions of Gene Kvassay and Patricia McEnulty.

### T. Default Judgment against the Class Members

On February 2, 2000, Defendant Hasty filed a Motion for Summary Judgment and

Memorandum brief in support thereof against pro *se* third-party Defendant Vernell Stidham.

On February 4, 2000, Wallace Saunders filed a Third Motion for Default Judgment against thirty-seven (37) individual third-party Defendants who did not answer the Third–Party Petition. Wallace Saunders also filed a Memorandum brief in support of its Motion, in which it represented to the Court that Armored Services, as third-party plaintiff, was entitled to a default judgment against each of these individuals for a stated amount of money. However, Defendants stress that the judgments which Defendant Hasty sought to obtain were for indemnity and were contingent upon the outcome of the Clinic's claim against ASI.

In serving its Memorandum in Support of Third Motion for Default Judgment, Wallace Saunders again communicated the indemnity obligation of each of the thirty-seven (37) individuals against whom default judgment was sought to each of the other individuals, and also to Gene Kvassay, Patricia McEnulty, and Vernell Stidham.

On February 10, 2000, the Hasty Defendants filed a Response in the Related State Action in opposition to Wichita Clinic's Motion to Strike/Dismiss the Hasty Defendants' Third–Party Petition, wherein the Hasty Defendants represented to the Sedgwick County District Court: "[Wichita Clinic] has taken all that money collected at the effort of [ASI]. It was collected because [Wichita Clinic] refused to make the effort."

On February 25, 2000, the Hasty Defendants filed a Response in the Related State Action in opposition to Wichita Clinic's Motion to Strike/Dismiss Wichita Clinic's patients (*e.g.*, the Kvassay class members) from the Related State Action, the Hasty Defendants represented to the state court:

We brought these folks in, first by letter in September of '99. . . . And the money has gone to [Wichita Clinic]. [Wichita Clinic's] counsel was concerned when the third party action was filed, What are you going to do if someone pays? [Armored Services, Inc.], being the Defendant, [is not] entitled to the money. And I think that's absolutely right. We said, We have asked them all to make the check payable to the Clinic, and it will go immediately to you, [Wichita Clinic's] counsel. And that's exactly what happened, except for those few that, for some reason, made the check payable to my office. Those were endorsed to the Clinic and sent to Plaintiff's counsel. Plaintiff has taken all the money.

On March 10, 2000, Defendant Hasty obtained default judgment on the claims made against 28 individual Defendants who failed to answer or plead to the Third Party Petition. The Journal Entry of Default Judgment against these individuals was filed on March 30, 2000.

## U. The Second *Kvassay* Letters

On March 15, 2000, the Hasty Defendants mailed form letters (the Second *Kvassay* Letters) to the 28 individuals against whom default judgment had been obtained, each stating as follows:

Re: *Wichita Clinic, P.A. v. Armored Services, inc. v. [Name of addressee]*

Case No. 99–C–1851

Our File No. 79,631

Dear [Name of addressee]:

As a result of your failure to appear in Court on March 10, 2000, the Court entered default judgment against you. As you know, the Wichita Clinic has filed suit against Armored Services, Inc. claiming that a check written by you was delivered to Armored Services, Inc. for delivery to the Wichita Clinic's bank.

Plaintiff claims that the bag was lost or stolen and that the instrument written by you was never deposited and therefore never presented to your bank and honored and the money withdrawn from your account. I represent Armored Services, Inc.

Wichita Clinic, P.A. has sued Armored Services, Inc. claiming that there was an instrument in the lost or stolen bag and written by you, in the amount of [dollar amount]. Wichita Clinic claims that it attempted to get you to replace the instrument, but you refused.

Please send me a check made payable to Wichita Clinic in the amount of [dollar amount]. Upon receipt of your check, the judgment against you will be satisfied.

*Failure to satisfy the judgment will allow the Defendant to utilize due process of law to garnish wages or income, garnishment [sic] of bank accounts, and seizure [sic] of other assets as allowed by the State of Kansas to* satisfy the obligation

*This is an attempt to collect an obligation or debt. Any information you supply may be used in an attempt to have the judgment against you satisfied.*

> Very truly yours,
>
> Paul Hasty, Jr.
>
> For the Firm

(Emphasis added).

Defendant Hasty has admitted that, at the time he sent the Second *Kvassay* Letters, he could not have executed on the default judgments against the addressees thereof. Defendant Hasty forwarded copies of a representative Second *Kvassay* Letter to Defendants Ya Deau and Clark Hanness, of Defendant FirstCity's Claims Department, along with a list of addressees and a post script indicating "Similar letters were sent to other third-party Defendants against whom judgment has been entered." On February 2, 2000, the Sedgwick County District Court sustained Wichita Clinic's Motion for Protective Order.

## V. Demand that Wichita Clinic sue the Class Members

On February 3, 2000, Defendant Hasty sent correspondence to Balkin providing, in pertinent part:

> Demand is hereby made that the Clinic immediately institute suit against the maker[s] of the instruments that the Clinic claims were lost or stolen and not replaced. Those persons are third party Defendants and plaintiff may assert its claim by way of a cross-claim in the current suit. Defendant demands that plaintiff do so immediately.

Defendant Hasty's correspondence to Balkin of February 3, 2000, referenced directly above, was sent with the express approval of Defendants FirstCity and Hiscox. On January 31, 2000, Defendant Hasty faxed a draft copy of said demand to Defendant FirstCity's Claims Department, along with cover correspondence suggesting that the demand be sent and advising that Defendant Hasty would send it unless he heard from Defendant FirstCity that it disagreed. Anthony Durnford, claims underwriter for Defendant Hiscox, reviewed Defendant Hasty's draft demand letter, and he made the Hiscox "scratch" on Defendant Hasty's proposal. On February 1, 2000, Defendant FirstCity's Claims Department wrote to Defendant Hasty to advise, in pertinent part:

> Thank you for your facsimile dated 31 January 2000 attaching your proposed letter in relation to the above circumstance. The leading Underwriter has noted your comments and agreed to the issue of the letter.

On or about February 7, 2000, Amy Lemley, as personal counsel for Wichita

Clinic, sent correspondence to Defendant Hasty, advising, in pertinent part:

I am in receipt of a letter dated February 3,2000 to Mr. Balkin in which you accuse the Wichita Clinic of completely refusing to cooperate in trying to obtain replacement instruments, and of actively interfering in your efforts to obtain them.

The Wichita Clinic has fully and completely cooperated in recovery of all checks larger than $20.00. The Clinic has also consistently sought to hold ASI to its agreement with respect to the approximately 700 patients who had checks $20.00 or less in the bag your client lost or stole. The Clinic hereby makes the same response to every letter you have written before and every letter you write in the future.

Your threats are irrational, unreasonable, and unprovoked. This is particularly true given the Court's ruling on [Wichita Clinic's Motion for Protective Order on] Wednesday...

You have no right to demand that the Clinic sue its patients.

On February 17, 2000, Trevor Wohlford, of Foulston Siefkin L.P., sent correspondence to Defendant Hasty, enclosing a draft Order reflecting his understanding of the Court's ruling on the Motion for Protective Order for Defendant Hasty's signature and approval.

On February 18, 2000, Defendant Hasty sent correspondence to Trevor Wohlford, of Foulston Siefkin L.P., regarding the journal entry on Wichita Clinic's Motion for Protective Order, stating, in pertinent part:

I cannot agree to the Order you proposed. I don't think the Court stayed any contact with the third-party Defendants. In fact, the Court recognized that any contacts [sic] that was already in the "stream" could proceed. As you know, the third-party Defendants are *continuing to contact me to make substitute payments.* Those are being sent on to the plaintiff.

I did agree that I would not initiate any collection activity against the Exhibit D persons or initiate any communication toward them to make collection.

## W. Defendant Hasty's Plan for Settlement

On February 25, 2000, Defendant Hasty faxed correspondence to Defendant FirstCity's Claims Department advising that the Sedgwick County District Court denied Wichita Clinic's Motion to Dismiss the Defendant's third-party claims. Defendant Hasty further requested authority to make a settlement offer. Although he noted that Wichita Clinic would not be very happy about certain terms of his proposed offer, Defendant Hasty advised: "I think we have a chance of getting the case settled on that basis because the plaintiff really does not want us pursuing the people on Exhibit D because they don't want several hundred more telephone calls from those people." (Emphasis in original).

Defendant Hasty did receive express authority for his proposal of February 25,-2000, from Clark Hanness, of Defendant FirstCity's Claims Department. Anthony Dumford, claims underwriter for Defendant Hiscox, reviewed Defendant Hasty's proposal and expressly authorized the same by writing "Agreed proceed on this Basis" and by making the Hiscox "scratch" on the face of the document. On February 1, 2000, Mr. Hanness wrote to Defendant Hasty to advise, in pertinent part:

Thank you for your facsimile dated 25 February 2000 attaching your latest advice in relation to the above circumstance.

Your comments have been seen and noted by the leading Underwriter who has

agreed to proceed on the basis outlined in your facsimile.

Defendant Hasty did make the settlement offer as proposed; however, it was not accepted by Wichita Clinic / St. Paul. On March 15, 2000, Defendant Hasty wrote to Clark Hanness, of Defendant FirstCity's Claims Department, and advised that the "total owed" by the individuals on Exhibit C was $2,783.32.

## X. Third *Kvassay* Letters

On April 10, 2000, Defendant Hasty sent form letters (the Third *Kvassay* Letters) to twenty (20) of the individuals against whom default judgment had been obtained, along with a Journal Entry of Default Judgment, reflecting the judgment entered against each of the other addressees. The Third *Kvassay* Letters each stated as follows:

> Re: *Wichita Clinic, P.A. v. Armored Services, Inc. v. [Name of addressee]*
> Case No. 99–C–1851
> Our File No. 79,631
> Dear [Name of addressee]:
> I enclose a copy of the Court's Order entering default judgment against you in the sum of [dollar amount]. If you do not satisfy this judgment, *I will take steps authorized by the law of Kansas to force payment of the judgment by execution on your property, garnishment of wages and bank accounts, or any other remedy available under the law of the State. If you don't want that to occur, please send me a check in the sum of $67.20 made payable to Wichita Clinic. This is an attempt to collect a judgment that has been entered against you and any information you supply may be used to assist me in collecting the judgment.*
>
> Very truly yours,
>
> Paul Hasty, Jr.

For the Firm

(Emphasis added).

Defendant Hasty forwarded copies of a representative Third *Kvassay* Letter to Defendant Ya Deau and Clark Hanness, of Defendant FirstCity's Claims Department, along with a list of addressees and a post script indicating "Similar letters sent to 20 additional third-party Defendants against whom judgment has been entered."

On April 11, 2000, Defendant Hasty filed a Sixth Motion for Default Judgment against third-party Defendants Sharon Cox and Bobby Hubbard and a Memorandum in support thereof. In support of his Motion, Defendant Hasty asserted that ASI was entitled to a default judgment against these individuals for the amount of missing, not replaced checks and indemnity judgment amount.

Patricia McEnulty inadvertently overlooked the Notice of Deposition, which was served on her along with numerous other pleadings and papers. Accordingly, she did not appear for her deposition on February 9, 2000. The Hasty Defendants thereafter sought to impose sanctions against her for failure to appear. Mrs. McEnulty filed a Response in opposition to Defendants' Motion for Sanctions, to which Defendant Wallace Saunders filed a four-page Reply. Ultimately, Mrs. McEnulty prevailed on the Motion, when no one from Wallace Saunders appeared at the scheduled hearing.

Defendant Wallace Saunders deposed Patricia McEnulty concerning her alleged obligation of $113.95. The court reporter expenses incurred in taking Ms. McEnulty's deposition were $334.05, almost three times the amount of her alleged obligation to Wichita Clinic. Defendant FirstCity paid this invoice without complaint.

Patricia McEnulty, acting pro se, ultimately agreed to make a replacement pay-

ment of $113.00 after Defendants served her with written discovery, deposed her, and subjected her to a Motion for Sanctions relating to her deposition. Gene Kvassay, represented by counsel, ultimately agreed to make a replacement payment of $88.00 after Defendants served him with a Notice to take his deposition.

On March 20, 2000, Defendant Hasty filed a Motion to Rescind Protective Order, requesting leave to resume communications with the individuals on Exhibit D. The next day, the Sedgwick County District Court denied Defendant Hasty's Motion.

Plaintiffs allege but do not prove that with regard to check reconstruction effort, Defendant Hasty did not care whether the affected individuals replaced lost payments by cash or by check. Plaintiffs do prove that with regard to the potential payments of indemnity judgments, Defendant Hasty did not care whether the affected individuals replaced lost payments by cash or by check.

Defendant Hiscox paid all of Defendant Wallace Saunders' invoices without complaint. Defendant FirstCity transferred these funds.

During that time, Defendant Hasty expressed concerns over accuracy of the information on Exhibits C and D.

At no time did Defendants ASI, Hiscox, FirstCity, or any of the underwriters agree to take an assignment of any rights Wichita Clinic had against the makers of any instruments lost with the missing deposit bag. Defendants ISS and Ya Deau were paid for their services by Defendant Hiscox and other underwriters. Defendant FirstCity transferred the funds.

The total alleged to be owing for the approximately 735 accounts listed on Exhibits C and D was $18,051.62 ($10,914.92 on Exhibit C + $7,136.70 on Exhibit D). The Hasty Defendants' fees and expenses

for pursing the alleged makers of checks herein exceeded the aggregate amounts for all accounts listed on Exhibits C and D. On November 20, 2000, the Hasty Defendants filed a Pretrial Questionnaire in the Related State Action on behalf of Defendant ASI asserting a "credit/offset for the attorney's fees incurred by [Defendant ASI] in recovering monies to date.... Those attorney's fees are $57,167.06." However Defendants stress that the Wichita Clinic's suit against ASI was for more than $64,0000 and attorneys' fees.

### Y. Wallace Saunders' Other Business Practices

Parties are in dispute over the majority of facts concerning the Hasty Defendants' business practices and debt collection activities. The following facts have been established.

Mark Bodine, a Wallace Saunders attorney and shareholder, has accepted and performed consumer debt collection work since at least 1989; and there has never been a time where Mr. Bodine refused to accept consumer collection work. Mark Bodine, an attorney at Wallace Saunders, is considered by the attorneys at the Wallace Saunders firm as the firm resource on FDCPA matters. Wallace Saunders attorneys consult him on matters concerning the FDCPA.

On or about November 29, 1989, a memorandum was circulated to all Wallace Saunders attorneys by Mark Bodine, providing, in pertinent part:

It has come to my attention that some attorneys in this office are unaware that the Fair Debt Collection Practices Act has regulated attorney's debt collection actions since July of 1986. When attempting to collect a consumer debt, care must be taken not to violate the FDCPA and turn a relatively small collection case into a potential $1,000 coun-

terclaim. Anytime you are hired to collect consumer debt, certain disclosures must be made. I have attached a form letter that I currently use in my consumer debt collections. The information contained in this letter is required by law and I suggest it be used for collection of consumer debts.

Initially Defendant Wallace Saunders represented to the Plaintiffs and to the Court that it had handled 182 consumer debt collection matters on behalf of creditors during the years 1996 through 2000.

Defendant Wallace Saunders refused to produce documents responsive to certain of Plaintiffs' Requests for Production, intended to assist Plaintiffs in uncovering Defendant Wallace Saunders' prior debt collection activities, based on objections including relevance and undue burden.

In particular, Defendant Wallace Saunders objected to Plaintiffs' Requests for Production No. 37, which asked for production of "any and all documents [Defendant Wallace Saunders] sent to and/or received from the Defendant and/or the Defendant's counsel in connection with any of the following Sedgwick County, Kansas civil actions: 98C2805, 98C3299; and/or 99C3240."

After Plaintiffs filed a Motion to Compel, the Court sustained Defendant Wallace Saunders' relevancy objection with regard to the requested documents referenced in the paragraph directly above. (Memorandum and Order dated February 26, 2002, at pp. 52–53). In so ruling, the Court stated:

> If these cases are ultimately shown to involve collections of consumer debts that would fall within the purview of the FDCPA, they will presumably be included among the 182 debt collection cases identified by Defendants in their responses to Plaintiffs' discovery requests.... If they are consumer collection cases and are not included in the

182 cases disclosed by Defendants, this would raise a serious question as to the thoroughness of Defendants' record search and could lead the court to reconsider this request in the future.

Sedgwick County, Kansas civil actions: 98C2805, 98C3299; and/or 99C3240 were not included in Defendant Wallace Saunders' initial count of 182 consumer debt collection matters, even though Plaintiffs had produced copies of the court files in connection with Plaintiffs' initial Rule 26 disclosures.

After the Court issued its Memorandum and Order on Plaintiffs' Motion to Compel, Defendant Wallace Saunders supplemented its interrogatory answers, then representing to Plaintiffs and to the court that it had handled 312 consumer debt collection matters on behalf of creditors during the years 1996 through 2000.

Sedgwick County, Kansas civil actions: 98L04625, 98C3299; and/or 99C3240 were not included in Defendant Wallace Saunders' supplemental count of 312 consumer collection matters, even though Plaintiffs had produced copies of the Court files in connection with Plaintiffs' initial Rule 26 disclosures and the Court had specifically addressed two of these cases in its Memorandum and Order.

It cannot be conclusively determined from the face of the documents produced by Defendant Wallace Saunders whether or not Sedgwick County Kansas civil action 98C2805 was counted in Defendant Wallace Saunders' supplemental count of 312 consumer collection matters.

After Plaintiffs cross-examined Defendant Wallace Saunders' managing partner, Mark McKenzie, with copies of the files from Sedgwick County, Kansas civil actions 98L04625, 98C3299; and 99C3240 at Mr. McKenzie's deposition, Defendant Wallace Saunders again supplemented its

interrogatory answers to add those cases, which it had not previously counted.

Defendant Wallace Saunders also obtained amended and/or supplemental affidavits from three of its attorneys to include these cases in its count of consumer debt collection matters handled on behalf of the creditor.

Defendant Wallace Saunders now contends that its debt collection activities for the period 1996 through 2000 are accurately reflected by the documents attached as Tab 11(A) to the Appendix to Defendants Hasty and Wallace Saunders Memorandum in Support of their Motion for Summary Judgment. By admission, Wallace Saunders engaged in third-party consumer debt collection activity on 315 separate matters (not including the matters before the Court) during the period 1996 through 2000, including 198 consumer collection matters in the two years prior to the conduct complained of herein. More than 1/3 of the files assigned to Wallace Saunders attorney and shareholder Mr. Bodine during the years 1996 through 2000 were consumer debt collection matters on behalf of the creditor. More than 800 of the files assigned to Wallace Saunders attorney Scott Flucke during the same five-year period involved consumer debt collection on behalf of the creditor.

It cannot be conclusively determined from the face of the documents produced by Defendant Wallace Saunders whether or not Sedgwick County Kansas civil action 98C2805 was counted in Defendant Wallace Saunders' second supplemental count of 315 consumer collection matters.

The principal purpose of Wallace Saunders' business is insurance defense litigation. This is broken down into two major groups, liability defense and workers' compensation defense. The liability defense work is spread out over several different practice areas, the biggest being professional liability defense, automobile, premises liability and product liability. Wallace Saunders also has a growing business and construction practice. This constitutes approximately 25 percent of its business. This broad category includes litigation, corporate, real estate, estate planning, and probate. Wallace Saunders does not utilize, and does not own, any specialized computer programs for the purpose of debt collection.

The principal purpose of Hasty's business as an attorney at Wallace Saunders is insurance defense litigation. Hasty does not utilize, and does not own, any specialized computer programs for the purpose of debt collection. Hasty has never specifically advertised any debt collection services, nor has he held himself out publicly as a "debt collector."

At or about the time the Hasty Defendants mailed the letters at issue in this litigation to the class members, Defendant Wallace Saunders was the largest law firm in the State of Kansas.

The documents contained in Plaintiffs' App. 117 and 40 are true and correct copies of letters received by the Hasty Defendants in response to the Hasty Defendants' letters to Wichita Clinic's patients of September 2, 1999, December 10, 1999, and or/ December 14, 1999.

In his deposition, Defendant Hasty was asked whether he considered the impact his demand letters might have on the recipients. Hasty replied: "Well, yeah. I wanted to impact them. I wanted them to replace the instrument."

### Z. Facts relating to Plaintiffs' damages

The named Plaintiffs are not seeking actual damages for themselves in this action, and they are not aware of any actual damages suffered by any class member. There is no evidence in this case that any

of the lost checks (the checks payable to the Clinic that were in the deposit bag) were ever presented for payment at the makers' banks, and there is no evidence that any of the makers of those checks incurred any un-reimbursed "stop-payment" or investigation expenses in connection with those lost checks. However, Plaintiffs emphasize that because the Defendants agreed to bifurcate this class action on the issue of liability, they have made no inquiry to determine whether any of the class members' alleged lost checks were ever presented at the makers' banks or whether any of the class members incurred unreimbursed stop payment or investigation expenses in connection with the lost payments to Wichita Clinic.

## AA. Facts relating to the involvement of the WTG Defendants

The Plaintiffs to this action were never directly contacted by ISS, Ya Deau, FirstCity, ASI or Hiscox. In other words, neither ISS, Ya Deau, FirstCity, ASI, nor Hiscox sent letters, otherwise demanded payment or communicated with the Plaintiffs. Hasty wrote the *Kvassay* and *Stark* letters himself; no other Defendants wrote the letters. However, Plaintiffs stress that the letters were written by Hasty, on behalf of Defendant Wallace Saunders and the WTG Defendants. Prior to sending out the letters, Hasty did not request permission or otherwise notify ASI, ISS, Ya Deau, FirstCity or Hiscox of the contents of the demand letters or that the contents of those letters potentially implicated the FDCPA.

There is no evidence that, prior to the filing of these actions, the WTG Defendants or Defendant Wallace Saunders ever repudiated Defendant Hasty's actions against the class members herein. However, the WTG Defendants stress that "Hasty never discussed his exact strategy with Hiscox, nor the fact that his actions may implicate the FDCPA, to give Hiscox the opportunity to meaningfully object to them."

In response to an interrogatory seeking facts and evidence supporting Plaintiffs' claim that ASI, ISS, Ya Deau, FirstCity, and Hiscox are debt collectors as defined by the FDCPA, Plaintiffs answered in part:

> At this early stage of the discovery, Plaintiffs cannot fully Answer this Interrogatory, but will supplement same as discovery progresses in this matter and in accordance with Fed.R.Civ.P. 26(e).

The answer continues by referring only to alleged collection efforts in this lawsuit and a related class-action lawsuit, *Stark v. Hasty et al.,* and states that "Plaintiffs expect to discover additional, unrelated consumer debt collection activities undertaken by Defendants during the course of discovery herein." Plaintiffs have not supplemented this interrogatory answer by describing additional, unrelated consumer debt collection activities.

ASI, ISS, Ya Deau, FirstCity, and Hiscox filed a motion to dismiss Plaintiffs' Amended Complaint on January 11, 2001. This Court denied that motion, allowing Plaintiffs "an opportunity to prove those allegations [contained in the Amended Complaint] through discovery."

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.,* 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary

judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents,* 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show. there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. Analysis and Discussion

#### A. The status of the alleged obligations under the FDCPA

The FDCPA was enacted to eliminate the "use of abusive, deceptive, and unfair debt collection practices." 15 U.S.C. § 1692. In order to fall under the regulation of the FDCPA, the parties in question must be attempting to collect a "debt." The FDCPA defines the term "debt" as:

any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

15 U.S.C. § 1692a(5).

■ The first step in the analysis of Plaintiffs' claims, then, is to consider whether the replacement checks [6] sought by the Defendants qualify as "debts" under § 1692a(5). Plaintiffs argue that the *Kvassay* letters "allege[d] an obligation to pay money;" that checks written to pay for a consumer transaction evidence debts; and that the alleged obligations in question fall under § 1692a(5)'s definition. Both the Hasty and WTG Defendants argue that "the spirit of the FDCPA is found in the regulation of the collection of *overdue* payment obligations." (emphasis in original). The Defendants argue that the FDCPA does not apply to the replacement checks they sought from the Plaintiffs, because the Plaintiffs' obligations to Wichita Clinic were not overdue. The Defendants also argue that Hasty was not attempting to collect "debts" since the Plaintiffs had already paid their obligations to Wichita Clinic.

Courts have yet to consider the FDCPA and its definition of "debt" in conjunction with missing or lost checks. However, in general, under the FDCPA the term "debt" has been interpreted broadly and extended to a variety of situations. *Arruda v. Sears, Roebuck & Co.,* 273 B.R. 332 (D.R.I.2002) (citing *Bass v. Stolper, Koritzinsky, Brewster, & Neider, S.C.,* 111 F.3d 1322, 1324 (7th Cir.1997)).

The Tenth Circuit has considered the FDCPA and its definition of "debt" in connection with a case involving dishon-

---

**6.** The court is mindful of the Plaintiffs' argument that the Defendants were seeking replacement payments, not replacement checks. However, the court will use the language of the first set of *Kvassay* letters which stated that the Plaintiffs should send replacement checks.

ored checks. In *Snow v. Riddle*, the Tenth Circuit held that "an offer or extension of credit is not required for a payment obligation to constitute a 'debt' under the [FDCPA]." 143 F.3d 1350, 1353 (10th Cir. 1998) *quoted in Ladick v. Van Gemert*, 146 F.3d 1205 (10th Cir.1998). Following the reasoning in *Bass*, the *Snow* Court concluded that a dishonored check which was written for consumer goods met § 1692a(5)'s definition of a "debt." 143 F.3d at 1353. This decision was consistent with the rulings in *Bass*, 111 F.3d at 1324; *Charles v. Lundgren & Assoc.*, 119 F.3d 739 (9th Cir.1997), *cert. denied*, 522 U.S. 1028, 118 S.Ct. 627, 139 L.Ed.2d 607 (1997); *Brown v. Budget Rent–A–Car Systems, Inc.*, 119 F.3d 922 (11th Cir.1997); and *Duffy v. Landberg*, 133 F.3d 1120 (8th Cir.1998) *cited in Snow*, 143 F.3d at 1353. Based on *Snow*, it is clear that an extension of credit is not required in order for the Plaintiffs' obligations to qualify as "debts."

Although *Bass* focused on "debt" in a case involving dishonored checks, the court's discussion of § 1692a(5) is instructive. As stated by the *Bass* court in examining the definition of "debt", "we first focus on the clear and absolute language in the phrase, 'any obligation to pay.' Such absolute language may not be alternatively read to reference only a limited set of obligations." 111 F.3d at 1325 (citations omitted). The Defendants argue that the FDCPA's definition of "debt" should not include the Plaintiffs' obligations to Wichita Clinic, because they were not overdue. Yet, the clear and absolute language of § 1692a(5) does not restrict "debts" to those payment obligations that are overdue or in default. § 1692a(5)'s definition of "debt" broadly encompasses "any obligation or alleged obligation of a consumer to pay money."

Furthermore, it is important to note that when analyzing notices or communications under the FDCPA, the court should operate from "the perspective of the least sophisticated consumer." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 34 (2d Cir.1996) (cited with approval in *Ferree v. Marianos*, No. 97-6061, 1997 WL 687693 at *1 (10th Cir.1997)). The *Russell* court stated "the test is how the least sophisticated consumer—one not having the astuteness of a 'Philadelphia lawyer' or even the sophistication of the average, everyday, common consumer—understands the notice he or she receives." *Russell*, 74 F.3d at 34.

The Defendants argue that when the Plaintiffs initially issued their checks to Wichita Clinic (before the checks were lost) "any obligation on their part to pay was suspended." The Defendants base this argument, in part, on K.S.A. § 84–3–310(b), which states that "if a note or an uncertified check is taken for an obligation, the obligation is suspended ... until dishonor of the check or until it is paid or certified." The Defendants state that "this statutory suspension treats the obligation as if it was discharged, holding that obligation in hiatus until the entity accepting the check can determine the check's validity through its deposit and payment."

The court must evaluate the Defendants' argument in conjunction with the "least sophisticated consumer test." The first set of *Kvassay* letters used strong language to instruct the Plaintiffs that they needed to send a replacement checks or proof that they had already paid. The letters stated that if they did not issue these replacements, then summons would be issued for the Plaintiffs as third-party Defendants. The letters also informed Plaintiffs that "the suit against you is to recover the amount of the lost or stolen checks tendered to the Wichita Clinic, P.A." Viewing the *Kvassay* letters from the perspective of the "least sophisticated consumer" it is clear that the recipients of

the letter believed that they were facing an "alleged obligation of a consumer to pay money." The court remains unconvinced that the Plaintiffs should have reasoned based on K.S.A. § 84–3–310(b) that their obligation to pay was suspended and that the *Kvassay* letters did not seek payment for a "debt."

A "debt," under § 1692a(5), must also arise out of a "transaction primarily for personal, family, or household purposes." For the purposes of the summary judgment motions, the Defendants do not contest this issue.

Considering all of these factors together, the court finds that the Plaintiffs' alleged obligations are "debts" as defined by 15 U.S.C. § 1692a(5) and grants partial summary judgment for the Plaintiffs on this issue and denies both the Hasty and WTG Defendants' summary judgment motion on this issue.

### B. The status of class members under the FDCPA

In order to qualify for relief under the FDCPA, the Plaintiffs must prove that they are "consumers." 15 U.S.C. § 1692a(3) defines consumers as "any natural person obligated or allegedly obligated to pay any debt." The Plaintiffs claim that they have met this standard and the Defendants do not contest the issue for the purposes of the summary judgment motions. Thus, the court finds that the class members are "consumers" as defined by § 1692a(3) and grants partial summary judgment for the Plaintiffs on this issue.

### C. The status of the Hasty and WTG Defendants under the FDCPA

The FDCPA was enacted to regulate the practices of "debt collectors." 15 U.S.C. § 1692 In order to fall under the regulation of the FDCPA, the parties in question must be "debt collectors." The FDCPA defines a "debt collector"

any person [ (1) ] who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of debts, or [ (2) ] who regularly collects or attempts to collect, directly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). The FDCPA also provides some specific exemptions from the definition of "debt collector," which will be discussed as relevant.

### 1. Hasty Defendants

The Plaintiffs contend that the "sheer volume and intensity of Defendants' debt collection activities directed against the patients/consumers of the Wichita Clinic for more than a year" meets § 1692a(6)'s requirements for 'debt collectors.'" The Hasty Defendants contend that they do not meet the FDCPA's requirements for "debt collectors."

The Plaintiffs concede that consumer debt collection is not the principal purpose of the Hasty Defendants' business. Thus, the court will focus its inquiry on whether the Hasty Defendants meet the second prong of § 1692a(6)'s definition. In other words, whether the Hasty Defendants "regularly collect[ ] or attempt to collect[ ], directly, debts owed or due or asserted to be owed or due another."

 Attorneys who "regularly collect or attempt to collect" debts are within the scope of the FDCPA's regulation. *Ditty v. CheckRite, Ltd., Inc.,* 973 F.Supp. 1320, 1336 (D.Utah 1997) (citing *Heintz v. Jenkins,* 514 U.S. 291, 299, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995)) (additional citations omitted). The FDCPA did not specifically set out a bright line test to determine what constitutes the regular collection of debts. Examining the issue in the context of attorneys and law firms, courts have considered a "the volume of the attorney's

collection activities, the frequent use of a particular debt collection document or letter, and whether there exists a steady relationship between the attorney and the collection agency or creditor he represented." *Schroyer v. Frankel*, 197 F.3d 1170, 1176 (6th Cir.1999).

Although the Tenth Circuit has not ruled on this issue, it has been considered by other Circuits. Several Circuits have focused on the percentage of an attorney's practice that consisted of debt collection. For example, in *Fox v. Citicorp Credit Services, Inc.*, the Ninth Circuit held that an attorney who stated that "98 to 100 percent of his practice from 1989 to 1991, and 80 percent from 1986 to 1989" involved debt collection was a "debt collector." 15 F.3d 1507, 1513 (9th Cir.1994). In *Schroyer*, the Sixth Circuit concluded that where only two percent of a law firm's practice consisted of debt collection cases and that the attorney in question's practice consisted of only 7.4% of debt collection cases, the parties did not "regularly collect debts." 197 F.3d at 1176. The Fourth Circuit held that an attorney who received 70–80% of his total fees from debt collection met the FDCPA's definition of a "debt collector." *Scott v. Jones*, 964 F.2d 314 (4th Cir.1992).

On the other hand, the Fifth Circuit has held that "if the volume of a person's debt collection services is great enough, it is irrelevant that these services only amount to a small fraction of his total business activity; the person still renders them 'regularly.'" *Garrett v. Derbes*, 110 F.3d 317, 318 (5th Cir.1997). The *Garrett* court found that "a person who, during a single nine-month period, attempts to collect debts owed another by 639 different individuals" qualifies as a "debt collector" under § 1692(a)(6). *Id.* at 318.

■ The majority of the facts regarding the volume and percentage of the Hasty Defendants' debt collection practices have not been established. Having reviewed the relevant caselaw, the court must conclude that it has insufficient evidence to find as a matter of law that the Hasty Defendants "regularly collect debts." Based on the limited number of facts that have been established, the court is unprepared to make a ruling based on a detailed percentage or portion of the Hasty Defendants' debt collection practices. Nor is the court convinced that the volume of the Hasty Defendants' activities directed against the Plaintiffs necessarily qualifies them as "debt collectors" under § 1692a(6).

On a separate claim, the Hasty Defendants also argue that they do not qualify as "debt collectors," because they fall within § 1692a(6)(F)(iii)'s exception to the definition of a "debt collector." The FDCPA exempts from its definition of "debt collector:"

> any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... (iii) concerns a debt which was not in default at the time it was obtained by such a person.

15 U.S.C. § 1692a(6)(F)(iii). Courts have held that parties obtaining debts, before those obligations are in default are not subject to the FDCPA's requirement. *Bailey v. Security Nat'l Servicing Corp.*, 154 F.3d 384, 387 (7th Cir.1998); *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir.1985); *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 107 (6th Cir. 1996).

The Plaintiffs argue that § 1692a(6)(F)(iii)'s exemption should not be invoked, because 1) the Hasty Defendants did not obtain any interest in the debts by assignment or otherwise; 2) the exemption was intended to apply to mortgage service companies and assignees obtaining a pre-default assignment of debt;

3) the debts were overdue based on K.S.A. § 84–3–304(a)(2).

The court will first examine the Plaintiffs' argument that the Hasty Defendants did not obtain any interest in the debts by assignments or otherwise. The FDCPA does not provide a specific definition of "obtain." *Franceschi v. Mautner–Glick Corp.*, 22 F.Supp.2d 250, 254 (S.D.N.Y. 1998). The Tenth Circuit has yet to examine § 1692a(6)(F)(iii)'s exemption and the meaning of "obtain" under the FDCPA, however, another district court has explored precisely this issue. The *Franceschi* court examined the use of the terms "obtain" and "assignment" in the Act and concluded that "the broader term 'obtain' in 1692a(6)(F)(iii) should not be read so narrowly as to be rendered just a synonym of 'assignment.'" *Id.* at 254. The *Franceschi* court concluded that "there is nothing in the statutory language to suggest that the term 'obtain' a debt should not be read to include the possession of the right and responsibility to collect a debt." *Id.* Likewise, this court is not persuaded that an assignment would be required for the Hasty Defendants to obtain an interest in the debts.

On June 17, 1999, the Wichita Clinic filed an action against Defendant ASI in Kansas state court. This action was based on allegations by Wichita Clinic that Defendant ASI had lost the "missing deposit bag." It is uncontroverted that the Hasty Defendants were engaged "to assist in the claims process and defend" ASI. In order to minimize ASI's potential liability, the Hasty Defendants' attempted to mitigate Wichita Clinic's alleged damages. This mitigation involved pursuing the collection of the Plaintiffs' alleged obligations. At this point, for the purposes of § 1692a(6)(F)(iii), the Hasty Defendants obtained an interest in the Plaintiffs' obligations. As the court has found that the plaintiff's alleged obligations were "debts,"

the court concludes that the Hasty Defendants did obtain an interest in the debts.

Considering the Plaintiffs' second argument, the court is not inclined to limit the scope of § 1692a(6)(F)(iii) solely to mortgage service companies and assignees. As the Plaintiffs, themselves, point out in their response, "as recently stated by the United States Supreme Court in *Hubbard v. United States,* 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779, (1995), courts are prohibited from reading into clear statutory language a restriction that Congress itself did not include." (Pls. Resp. in Opp'n at 45). The language of the exemption clearly says "any person," it does not restrict this exemption to mortgage service companies and assignees. Just as § 1692a(5)'s definition of "debt" broadly encompasses "any obligation or alleged obligation of a consumer to pay money;" § 1692a(6)(F)(iii)'s exemption broadly encompasses "any person collecting ... any debt which was not in default at the time it was obtained by such a person."

Thus, it is necessary to consider whether the Plaintiffs' debts were in default at the time they were obtained by the Hasty Defendants. Default is not defined within the FDCPA. *Skerry v. Massachusetts Higher Educ. Assistance Corp.,* 73 F.Supp.2d 47, 52 (D.Mass.1999). The Tenth Circuit has yet to explore this issue, but several district courts have examined FDCPA and "default." In *Skerry,* the court rejected the plaintiff's argument that the use of "default" in 1692a(6)(F)(iii) "must be construed, as synonymous with delinquency." 73 F.Supp.2d at 52. The *Skerry* court found that when the alleged debt collector was acting pursuant to its obligations under the Federal Family Education Loan Program (FFELP), the term default must be interpreted under the FFELP. *Id.* at 53–54. In *Hartman v. Meridian Financial Services, Inc.,* the

court looked to the terms of the contract between the Plaintiffs and their creditor, in order to determine when the Plaintiffs were in default. 191 F.Supp.2d 1031, 1044 (D.Wis.2002). The court also notes Federal Trade Commission Staff letter stating, "the FDCPA does not define the term 'in default,' but whether a debt is in default is generally controlled by the terms of the contract creating the indebtedness and applicable state or federal law." FTC Staff Opinion letter to Richard T. de Mayo by Thomas E. Kane; May 23, 2002, at *www. ftc.gov/os/statutes/fcpa/letters/demayo. htm* (citations omitted). The court notes that it is in no way bound by FTC Staff Opinions, but it may look to the FTC for guidance. Considering all of the aforementioned sources, the court concludes that the Plaintiffs' debts must be analyzed under applicable state law.

As briefly discussed earlier, the Defendants contend that when the Plaintiffs initially issued their checks to Wichita Clinic (before the checks were lost) "any obligation on their part to pay was suspended." The Defendants cite K.S.A. § 84-3-310(b), which states that "if a note or an uncertified check is taken for an obligation, the obligation is suspended ... until dishonor of the check or until it is paid or certified." The Defendants argue that the Plaintiffs' debts remain in this statutory hiatus and are not in default. On the other hand, the Plaintiffs contend that application of the Kansas statutes confirms that the checks were overdue at the time the Hasty Defendants obtained the debts. Plaintiffs cite K.S.A. § 84-3-304(b) which states "an instrument payable on demand becomes overdue at the earliest of the following times ... if the instrument is a check, 90 days after its date."

The Plaintiffs accurately apply § 84-3-304(b); their checks were overdue at the time the Hasty Defendants obtained the debts. However, the court is reluctant to equate an overdue lost check with a check that is in default. § 84-3-304(b) does not indicate that an overdue check or that the obligation the check evidences, is in fact in default. The comment to this section states, "a check becomes stale after 90 days." The comments do not indicate that a stale check nor the obligation it evidenced are necessarily in default. K.S.A. § 84-3-304(b) cmt. 1. § 84-3-304(b) makes a distinction between checks and time instruments such as installment payments and it does discuss when such items become "overdue upon default under the instrument." A similar discussion is not provided for overdue checks.

In fact, K.S.A. §§ 84-3-309 and 84-3-310 detail the enforcement of a lost instrument. The comments to § 84-3-310 indicate that the once a check is taken and an obligation is suspended, then "thereafter all collection efforts have to be taken through the instrument until it is dishonored." K.S.A. § 84-3-310 cmt. b. At this point, one can seek to enforce a lost instrument under § 84-3-309. However, parties cannot initiate suit on the underlying contract; only the instrument can be enforced. *Id.* § 84-3-309 allows for this enforcement as long as certain statutory conditions are met. If these statutory conditions are met and the court concludes that "the person required to pay the instrument is adequately protected against loss," then judgment may be entered in favor of the person seeking enforcement. K.S.A. § 84-3-309.

The Plaintiffs tendered checks to Wichita Clinic, the checks were lost, ninety days elapsed, and the Plaintiffs' checks became overdue or stale. However, the Plaintiffs' checks did not automatically become in default. At this point, Wichita Clinic had the ability to seek to enforce the instruments tendered by the Plaintiffs, *i.e.* their lost checks. The Clinic did not have the

ability to enforce the underlying obligations evidenced by the lost checks. Absent enforcement under § 84–3–309, the court cannot conclude that the Plaintiffs' checks are in default merely because they are overdue. The court concludes that the Plaintiffs' obligations remained in suspension as discussed in § 84–3–310(b). Therefore, at the time the Hasty Defendants obtained the Plaintiffs' debts, the debts were not in default.

Finally, the court notes that the Plaintiffs, themselves, did not consider their obligations to Wichita Clinic to be overdue or in default. While this evidence is not conclusive, a determination of default does depend on the application of statutory law, it certainly points to the court's finding that the debts were not in default.

The court finds that the Hasty Defendants qualify for the "debt collector" exemption under § 1692a(6)(F)(iii). The court grants summary judgment for the Hasty Defendants, holding they were not debt collectors within the meaning of the FDCPA; dismisses the Hasty Defendants from this action; and denies summary judgment for the Plaintiffs on this issue.

## 2. WTG Defendants

■ The Plaintiffs contend that the WTG Defendants are "debt collectors" as defined by the FDCPA. The WTG Defendants argue that they do not fall under this definition. For the reasons discussed herein, the court grants summary judgment for the WTG Defendants as well, as they were not debt collectors within the meaning of the FDCPA. The court further dismisses the WTG Defendants from this action and denies summary judgment for the Plaintiffs on this issue.

IT IS THEREFORE ORDERED this 31st day of December, 2002 that the court grants the Plaintiffs' motion (Dkt. No. 134) in part and denies the motion in part; grants the Hasty Defendants' motion (Dkt. No. 129) in part and denies the motion in part, and denies the WTG Defendants motion in part and grants the motion in part (Dkt. No. 138). Accordingly, the court dismisses the claims against the Hasty and WTG Defendants.